108 So.2d 435

**James Phillip METCALF**

v.

**STATE.**

**6 Div. 372.**

Court of Appeals of Alabama.

Aug. 19, 1958.

Rehearing Denied Sept. 9, 1958.

Jenkins & Cole, Birmingham, for appellant.

John Patterson, Atty. Gen., and Jas. W. Webb, Asst. Atty. Gen., for the State.

**CATES, Judge.**

Metcalf was indicted November 11, 1955, for the murder (in the first degree) of Johnnie Mulkin. The trial held January 9 through 13, 1956, resulted in a verdict of guilty of second degree murder with his punishment fixed at ten years in the penitentiary. Judgment was rendered accordingly.

On February 9, 1956, a motion for new trial was filed and presented to the trial judge and passed to March 9, with mesne continuances until November 8 of that year when the motion was heard and overruled.

The court reporter suffered a heart attack delaying the transcript of evidence of some 500 pages until January 28, 1957; the record proper did not reach us until March 28, 1957. In view of the size of the record, we allowed further time for briefs with the result that the case was not argued and submitted until the statutory call of the Sixth Division on December 5, 1957.

September 10, 1955, Mr. William A. Adams, a deputy sheriff, was called out to investigate the death of Mulkin at the latter's place of business near the county line on Highway 78 in the western part of Jefferson County.

Arriving at Johnnie's Place about 7:40 P.M., he found Mulkin's corpse with four bullet wounds: four entrance, two exit. Of the four, one went in the right side of the face, one in the right chest, one in an arm and an entrance wound into the heart region which the State sought to show came from the same bullet that went through Mulkin's arm.

A search of Mulkin failed to produce any deadly weapon.

Adams talked to Metcalf that night at the Jefferson County jail. After a proper showing of voluntariness in the inducement and ambient circumstances, Adams stated:

"* * * he made a statement that the son-of-a-bitch ought to have been killed and I am glad the bastard is dead. That is what he said at that time in relation to the killing."

Metcalf had a cut place in his head. The deputies took him to Jefferson Hillman Hospital to have it treated. On the way from the jail, Metcalf told Adams:

"* * * the reason he killed Johnny was Johnny caused his wife to have a miscarriage; said that Johnny had come down to Mr. Metcalf's house and told his wife some things and caused her to have a miscarriage.

\* \* \* \* \* \*

"* * * that Mr. Metcalf had been going with Johnny's wife, Anne Mulkin. * * *

\* \* \* \* \* \*

"'That I went up there to advise him or make him quit telling my wife those things.' We asked him about what time he went to Johnny's place that afternoon. He said around 5:00 or 5:30 in the afternoon. We asked him how he went into Johnny's place, through the front or through the back. He said he went in through the back door to keep Johnny from seeing him."

The voluntariness of these latter inculpatory statements was established by preliminary enquiries as was also done

regarding a later statement made by Metcalf to Adams when Metcalf had been admitted to the hospital:

"He said that he went up there to see Johnny, and went in the back door to keep Johnny from seeing him, and then he asked us to send him some roses at Kilby because he knew that he would get the 'hot seat.'"

Cross-examination elicited from Adams (inter alia) the following:

"Q. Did he tell you he was sitting in that rear booth and Johnny came back there and started beating him in the head with a stick? A. Yes, sir, I believe he did.

"Q. Did you find a stick there? A. Yes, sir, we did.

"Q. Did you find—is this (indicating) the stick that you found? A. Yes, sir.

"Q. And where did you find this stick? A. That was in Mr. Mulkin's hand.

"Q. Where he was lying on the floor? A. Yes, sir.

"Q. Was he grasping this stick by the handle or was he grasping it by the ground end when he had it? A. By the ground end.

\* \* \* \* \* \*

"Q. I show you here (indicating) a fountain pen gun and ask you whether or not that was on Mr. Mulkin's person? A. Yes, sir, I saw Mr. Butler take that."

Redirect testimony brought out that Mulkin's "pen gun" shot tear gas.

The next State witness was Mrs. Sarah Anne Dye, who worked in Mulkin's place. She saw Metcalf there the day of the killing; about 5:00 P.M., he was at the juke box. Mulkin was at the cash register, whence the witness testified it was not possible for one to see the juke box.

Mrs. Dye served Metcalf a shot of whiskey. Then he moved to another booth at the back of the dance hall. She saw a gun in the booth beside him.

There were some men sitting at a table which was between Metcalf's booth and the door through which he said he expected Mulkin to enter. Mrs. Dye stated:

"A. Well, when he told me to get these fellows to move, he said there might be a shooting, and he didn't want innocent parties getting hurt.

"Q. Didn't want what? A. Didn't want innocent parties getting hurt.

\* \* \* \* \* \*

"\* \* \* he said that Johnny was 'gunning' for him and he was 'gunning' for Johnny, and he was afraid of Johnny Mulkin."

The trial judge quite correctly pointed out that this was unclear and could not be taken as an unequivocal threat.

A deputy sheriff, Mr. Tom Ellison, took the witness stand and related substantially the same account of the confessions as Deputy Adams had given. He also related a conversation of Metcalf's about Metcalf's gun.

The defense, on cross-examination, brought out:

"Q. Now, when you first saw Mr. Metcalf, what was his condition in so far as—what was his appearance? A. Well, he was highly intoxicated. I didn't—

"Q. Where was he? A. In the County Jail.

"Q. And describe his appearance as far as blood and abrasions together you saw on him? A. He had a laceration, I would say about an inch and a half long or maybe an inch, right in the top of his head.

"Q. Any blood on him? A. No, sir, he had a little blood around this cut place was the only blood that I saw.

"Q. Was there any blood on his face? A. No, sir.

"Q. Do you know whether his face had been washed or not? A. Well, I found out that it hadn't been washed.

"Q. Any signs where he had wiped any blood off of his face? A. Not that I noticed, no, sir."

Ellison was asked whether he heard that Mulkin killed people; objection was sustained. Another question excluded on the State's objection went to Mulkin's killing a man named J. P. Creel.

Error is claimed in the following excerpt:

"Q. Have you heard it said that other people had been killed there in that place of business?

"Mr. Rogers: Now, we object to that.

"The Court: Yes, sustained.

"Mr. Jenkins: The character and reputation of the place of business itself, Your Honor.

"The Court: I will sustain the objection.

"Mr. Jenkins: We reserve an exception.

"Q. All right, have you heard it said that Johnny Mulkin had killed other people there at that place or near that place? A. I reviewed an investigation—

"Q. Just answer that question. A. That is what I am fixing to tell you. I reviewed an investigation that was shown—

"Mr. Jenkins: Now, Judge, I am entitled to a responsive answer.

"The Witness: That is what I am trying to tell him.

"Q. Have you heard that Johnny Mulkin had killed men there at that place?

"Mr. Rogers: Judge, he is not limited to 'Yes' or 'No.'

"Mr. Jenkins: Yes, sir, I am limiting him.

"A. This investigation that I made shows—

"The Court: Have you heard—

"Q. Have you heard that he was killed? A. —that Johnny killed a burglar out there in his own home after the fellow had shot him.

"Mr. Jenkins: If Your Honor please, that is not responsive and I move to exclude that answer.

"Mr. Rogers: We are willing for it to go out now.

"The Court: All right, let it go out.

"Mr. Jenkins: And I want to say this: That it certainly shows the feeling of the witness. He could have answered 'Yes' or 'No.'

"Mr. Rogers: And it shows the feeling of the attorney, if a man was killed there in burglarizing the place, and he is leaving the impression he wantonly shot a man down—

"The Court: Yes."

Also, Ellison identified as belonging to Mulkin a .38 caliber revolver with two notches on the handle; the gun apparently was kept under the counter near the cash register.

Mr. J. O. Butler, Deputy Coroner of Jefferson County, testified that in his opinion the gunshot wounds were the cause of Mulkin's death.

On Butler's cross-examination, the trial judge excluded any questions as to records or reports in the coroner's office relating to persons killed by Mulkin. The ruling was made with the jury withdrawn:

"The Court: All right, let it be shown, though, by the record that the court has permitted testimony as to vi-

olence and turbulence—character or reputation of the deceased or rather—

"Mr. Jenkins: Well,—

"The Court: —wait a minute. Don't interrupt me.

"Mr. Jenkins: All right.

"The Court: —rather his reputation for violence and turbulence and his reputation as a pistol toter and a knife toter and anything of that kind, all reputation, the court has admitted it.

"Mr. Jenkins: What witness, Judge?

"The Court: Wait a minute. It is in the record now, but as to any killings that he may have alleged to have committed of somebody else, that isn't a part of the law, as I see it, and I am not going to admit it.

"Mr. Jenkins: I am not going to ask him about his reputation. I am going to ask him about his reputation for pistol carrying.

"The Court: You can ask it, but you can't show it by the Coroner's records.

"Mr. Jenkins: You mean to tell me—

"The Court: Yes, sir, I mean to tell you what I have told you, and I don't mean to procrastinate and fool around with it any more.

"Mr. Jenkins: We reserve an exception.

"The Court: I don't want to get stern. Just bring the jury in and let's proceed with the trial."

Upon the return of the jury, the defendant's counsel continued with the cross-examination:

"Q. Mr. Butler, do you have a subpoena—do you have the records in response to that subpoena of the homiicide of one J. P. Creel by Johnny Mulkin?

"Mr. Rogers: Now don't answer that. We object to it, and I thought the court had ruled on it.

"The Court: I will sustain the objection and ask you, gentlemen, don't consider that whatever; it is an improper question. Mr. Jenkins knew it was an improper question when he asked it and I am instructing you don't consider it.

"Mr. Jenkins: Now, if Your Honor please, I want to reserve an exception to the statement of the court.

"The Court: No more questions like that, now, Mr. Jenkins, just don't ask another one.

"Mr. Jenkins: I want to except to the remarks of the court, and I want to make a motion for a mistrial, based on the remarks of the court.

"The Court: Overruled.

"Mr. Jenkins: We reserve an exception.

"The Court: Gentlemen, don't consider any of those remarks by the court about Mr. Jenkins. Mr. Jenkins has been instructed, in the absence of the jury, not to ask those questions, so I will—

"Mr. Jenkins: Judge, you didn't instruct me not to ask that question.

"The Court: Yes, I did.

"Mr. Jenkins: Well, I reserve an exception.

"The Court: He asked those questions and I will instruct you don't consider it. We will just proceed now.

"Mr. Jenkins: Well, I want an exception.

"The Court: All right.

"Q. Now, Mr. Butler, based on the records of your office and based solely on the records of your office under your supervision and control, do you

have knowledge of the character and reputation of Johnny Mulkin for being a violent and turbulent and a dangerous man, and for having killed a man, unarmed, by having shot him in the back—

"Mr. Rogers: Well, we object to that—

"Q. —and for being a man who would shoot in an unfair way, and take advantage of another man and take his life in an underhanded way?

"Mr. Rogers: Now, I am asking the court—

"Mr. Jenkins: I am asking that question.

"Mr. Rogers: Judge, if he continues with questions like that, the State is going to ask for a mistrial. The court has asked him—the question is so elementary, the elementary law would show that such questions are unfair and unjust.

"Mr. Jenkins: Judge,—

"Mr. Rogers: Let me get through will you? It is asked solely for the purpose of prejudicing this jury, and I ask the court here now, as an officer of the court, to instruct the jury, the court instructed him on questions of that nature, to ignore that question and give it no credence.

"Mr. Jenkins: Judge, now may I say, that question was not asked as to reputation.

"The Court: You asked it, as I understand it, on the—

"Mr. Jenkins: Based on the records.

"The Court: Based on the records of another killing.

"Mr. Jenkins: Judge, will you—

"The Court: Gentlemen, I will ask you, don't consider it at all. It was an improper question. Mr. Jenkins knew it was an improper question when he asked it. I have instructed him, outside of the presence of the jury and in the presence of the jury if he asked one more question like that then the court will have to take more severe action—

"Mr. Jenkins: Well,—

"The Court: —I will ask you don't consider it, gentlemen, for any purpose whatever.

"Mr. Jenkins: May I have an exception to the court's statements, and may I have an exception to the court's ruling, and may I make a motion for a mistrial, based on the statement of the court, the ruling of the court, and the action of Mr. Rogers in shouting at me and raising his voice at me the way he did.

"The Court: Overruled.

"Mr. Jenkins: We reserve an exception.

Thereupon, counsel posed the following question:

"Q. Well, now do you know, as Coroner of Jefferson County, the character, irrespective of where you got your knowledge, the character and reputation of this man, Johnny Mulkin, for violence and turbulence and whether or not he had a reputation for shooting unarmed men in the back?"

Objection was sustained:

"The Court: You said he had the reputation of shooting folks in the back. You have got just one instance of that. I don't think that would be general reputation for shooting people in the back.

"Mr. Jenkins: As I understand, Your Honor, you are ruling—

"The Court: You heard it, and that is plain.

"Mr. Jenkins: That one wouldn't have the reputation for shooting peo-

ple in the back, which was based on one incident of having shot one man in the back? Well, I want an exception to the court's ruling there.

"The Court: All right, bring the jury."

Thereupon, the judge, counsel, and court reporter retired to chambers where defendant's counsel outlined questions going to the witness' knowing that Johnnie's Place had a character and reputation "for its violence and bloodthirsty and turbulent conditions and surroundings." Objection was sustained.

There were questions based on records of the coroner's office as to whether or not Mulkin had a reputation as "a bloodthirsty man and a man who would carry out his bloodthirsty designs and who would act stealthily or treacherously." Objection was sustained.

Also:

"* * * then I would next like to ask him as to whether he had any knowledge of the deceased's character and reputation from any source other than the Coroner's records. * * *"

Mr. Freeman, who worked at Johnnie's Place, was asked:

"Q. I want to ask you if Johnny Mulkin had the character and reputation of a man who used to carry a pistol or who had a pistol at him or near him at all times?"

The State's objection was sustained.

Clayton Sellers, called by Metcalf, who had known Mulkin for eight or ten years, having a grocery store across the road from Johnnie's Place, was asked several questions going to Mulkin's reputation for being violent, turbulent and bloodthirsty. Then he was asked:

"* * * Did he have a general character and reputation there as that of a man who would walk up to an-

other man and ask for the other man's right hand and then shoot the other man with his left hand?"

The trial judge sustained the State's objection.

Metcalf, as a witness in his own behalf, related how Mulkin came up to the booth in which Metcalf was seated and began a tirade consisting mostly of such epithets as "you son of a bitch" and "damn liar." Mulkin went on, "You did it; you caused my wife to leave me." And then without provocation on Metcalf's part, Mulkin belabored him across the head with a heavy walking stick, saying, "You lying son of a bitch, I am going to kill you."

On cross-examination Metcalf admitted having two or three long distance phone calls to or from Mrs. Mulkin in Mississippi during July or August of 1955, and that on one occasion he met her in that State.

In describing his conversation with Mrs. Dye, he admitted saying:

"I told her there was some trouble between Johnny and I, and I wanted to get it straightened out before Johnny killed me or I had to kill him one. * * *"

As to the shooting, a portion of the cross-examination went:

"Q. Did you shoot him any after he was on the floor? A. I didn't shoot him. All I done was shoot. I don't remember. I was so scared I don't know what happened.

"Q. Did you shoot him after he was lying on the floor? A. I don't remember shooting him any.

"Q. You know one bullet was found lying under him on the floor, don't you? A. I heard that testified in court.

"Q. Well, will you tell the jury whether or not you shot him after he was lying down on the floor? A. I didn't.

"Q. Are you positive about that? A. I am not positive, but I am sure I didn't."

The defendant offered testimony of a number of witnesses, including several peace officers, to the effect that Mulkin bore a reputation for being violent, bloodthirsty and turbulent. He asked one witness the following:

"Q. I will ask you whether or not this place, known as Johnny's Place, had the reputation as being a place of violence, turbulence, and bloodthirsty conduct?

"Mr. Rogers: Judge, wait a minute. You have told Mr. Jenkins—

"The Court: I sustain the objection. I hold that is an improper question.

"Mr. Jenkins: I reserve an exception.

"The Court: I don't see how a place could have a reputation—"

■ Before argument of the case to the jury, defendant moved to exclude from use in argument by the State a photograph of Mulkin's body on the grounds that the blood and gore therein exhibited would or could be referred to, to the defendant's hurt and prejudice.

The picture had been admitted in evidence over objection. We consider the motion to exclude it from use in argument as superfluous, since the objection to the introduction in evidence of the picture as "prejudicial and inflammatory" was sufficient to preserve for review any error which might attend its reception.

■ We have viewed the picture and consider it had relevancy and probative worth within the rule laid down in Birmingham Baptist Hospital v. Blackwell, 221 Ala. 225, 128 So. 389, and applied in Grissett v. State, 241 Ala. 343, 2 So.2d 399.

■ Gruesomeness becomes objectionable in a photograph only where there is distortion of either of two kinds; *first*, distortion of the subject matter as where necroptic or other surgery causes exposure of nonprobative views, e. g., "massive mutilation," McKee v. State, 33 Ala.App. 171, 31 So.2d 656; or, *second*, focal or prismatic distortion where the position of the camera vis-a-vis the scene or object to be shown gives an incongruous result, e. g., a magnification of a wound to eight times its true size, Wesley v. State, 32 Ala. App. 383, 26 So.2d 413.

■ These two concomitants to taint with harmful prejudice a photograph otherwise gruesome, when analyzed, resolve themselves into nothing more than the failure of the photograph to reproduce (alone or with auxiliary testimony) the subject matter as of the pertinent moment of time.

Thus, in the second McKee appeal (the prejudicial photograph, Exhibit "J" of the first trial was not tendered, 35 Ala.App. 176, 44 So.2d 778), the enquiry was not one of tampering or tinkering with the subject matter of the picture nor with the camera or film, but as to the effect on relevancy of natural decay of a body exhumed and photographed eight days after death.

The late Mr. Justice Brown, in reversing this court, held that there was no error (merely a question of weight) in the admission of the photograph of the exhumed corpse merely because the picture was made a week or so after death if—and we attach all importance to this qualification—there was full and fair evidence to point out any easily distinguishable alterations such as embalming punctures and the like, 253 Ala. 235, 44 So.2d 781.

■ The instant photograph, according to the record, is unretouched, is not a "trick" shot, and (taken forty-five minutes or an hour after death) portrays the body of Mulkin unchanged, lying as he fell from Metcalf's shots. Its reception was without error.

■ The photograph having been admitted into evidence without limitation, restriction or confinement as to the issue,

purpose or extent of its reception, it necessarily follows there was no impropriety in it being used in argument, subject to the defendant's right to call on the court to confine the solicitor to relevancy and propriety as in other matters.

Thus, in Terry v. Williams, 148 Ala. 468, at page 471, 41 So. 804, at page 805, it is said:

"* * * Since the receipts were in evidence, counsel for plaintiff had the right to refer to them and to read them to the jury when making his argument. * * *"

See also Mitchell v. State, 114 Ala. 1, 22 So. 71.

■ Metcalf contends Gibson v. State, 89 Ala. 121, 8 So. 98, is authority for the trial judge being in error in refusing Metcalf's requested charge 7 (if shooting without malice, no murder), which was taken from the critical charge in the Gibson case.

There was no error in here refusing this charge because the trial judge fully and fairly charged the jury on the ingredients of both degrees of murder and of voluntary manslaughter. Moreover, Metcalf's charge 8, which was given, expressly stated that if the killing was not malicious, there could not be murder in either degree and his given charges 20 and 22, together with the oral charge, covered self-defense and the right of a person in danger to rely on the reasonable appearance of circumstances in defending himself.

This discussion also suffices for the refusal of charges 14, 15, 16 and 21.

■ Charge 23 (reasonable doubt as to defendant killing in well-founded belief of necessity) is charge 14 of Chaney v. State, 178 Ala. 44, 59 So. 604. In Chaney charge 14 was held apt because there was no evidence that the defendant had provoked the deceased.

In Brooks v. State, 263 Ala. 386, 82 So.2d 553, 555, we find:

"* * * the question of whether or not Charge No. 12 should have been hypothesized on freedom from fault in bringing on the difficulty depends upon whether there was evidence of this issue sufficient to make it a jury question. * * *"

In Metcalf's case other charges, particularly 22 and 27, and the oral charge adequately instructed the jury on the law of self-defense in all its phases fitting the evidence.

Here we cannot say there was no duty to retreat nor that there was only uncontradicted evidence of freedom from fault in bringing on the affray; see Nix v. State, 32 Ala.App. 136, 22 So.2d 449, Favors v. State, 32 Ala.App. 139, 22 So. 2d 914, and Dykes v. State, 34 Ala.App. 216, 39 So.2d 21.

■ Charges 24, 25 and 26 requested direction of the jury as to the legal aspect of the extent and degree of force permissible to repel an assailant. The defendant cites Martin v. State, 90 Ala. 602, 8 So. 858, and Crumley v. State, 18 Ala. App. 105, 89 So. 847, to show error in the refusal of the charges. Charge 24 approximates charge 9 in Martin [90 Ala. 602, 8 So. 860]; however, it omits, "and death accidentally resulted" and inserts "and even though death resulted." Charge 25 is like charge 12 in Martin, but omits "and did not use a weapon."

The Attorney General contends that given charges 22, 27 and 30, coupled with the oral charge, cover the law propounded by these refused charges 24, 25 and 26. While we do not find in the oral or given charges a clear cut expression that the defendant when cornered may use force sufficient only to repel his assailant—yet charge 27 (given) uses the expression, "if * * * the circumstances attending the firing of the fatal shot were such as to impress * * * the defendant, with a reasonable belief that at the time of firing the shot it was necessary in order to prevent death or great bodily harm

\* \* \* then \* \* \*". Hence, we believe that in the light of the evidence—a killing with a gun—it would be somewhat incongruous to use the old common law plea, *sed molliter manus imposuit:* the force of a self-defendant's bullet cannot, with a weapon like Metcalf's, be feasibly adjusted to balance with the force used by his attacker. Indeed, from this point of view, refused charges 24, 25 and 26 seem less favorable to Metcalf than given charge 27.

 Charge 40, predicated on Mulkin's use of provocative, opprobrious and abusive language, does not fit a case of homicide: Code 1940, T. 14, § 37; Taylor v. State, 48 Ala. 180, "No words however insulting, will excuse a homicide." Rogers v. State, 117 Ala. 192, 23 So. 82 (charge 5), does not apply; the indictment there was for an assault.

 Charge 46 is adapted from charge 5 in Hubbard v. State, 10 Ala.App. 47, 64 So. 633, 634, but is materially altered by the omission of the second predicate, viz., "and defendant retorted by using the character of the insult to the deceased." This omission (which was needful to fit evidence here, since Metcalf was not shown to have used opprobrious or abusive language in addressing Mulkin) alters the sense of the instruction from its context in the Hubbard case so as to make it appear that a verbal insult by Mulkin followed by an assault by Mulkin would justify Metcalf in defending himself "against such aggression." The discussion of charge 40 above suffices; there was no error in the refusal of charge 46.

 Charges 54, 61, 62 and 63, relating to the presumption of innocence and the need for the State to establish its case beyond a reasonable doubt, were adequately covered by the other given charges and by the oral charge.

 Charges 94, 95, 96, 98, 99, 100, 101 and 102 (charging defendant's knowledge of deceased's violent repute may be · considered as to *guilt*) were all properly refused, since here evidence of the deceased's reputation, including that of violence, was not admissible in connection with all theories, but only for limited purposes such as who was the aggressor or whether Metcalf would be allowed greater leeway in being forehanded to protect himself. Brooks v. State, supra. In McGuff v. State, 248 Ala. 259, 27 So.2d 241, 248, the court, per Foster, J., said:

> "Previous threats, whether or not communicated are under those circumstances, when self-defense is on the evidence sufficiently shown to justify its submission to the jury [admissible] for the purpose of showing quo animo of such demonstration or attack, Roberts v. State, 68 Ala. 156; or to shed light upon who was the aggressor, Turner v. State, 160 Ala. 40, 49 So. 828; Beasley v. State, 181 Ala. 28, 61 So. 259, or to give color and character to such aggressive conduct; and this rule applies to evidence of illwill, and previous difficulties in general terms, Narrell v. State, 222 Ala. 145, 132 So. 47; Buffalow v. State, 219 Ala. 407, 122 So. 633, and to evidence of the bad character of deceased for peace and quiet. Rutledge v. State, 88 Ala. 85, 7 So. 335." (Bracketed matter added.)

We have examined the other refused charges and consider their refusal was without error.

 On oral argument a great amount of time was spent in discussion and questioning as to whether or not a place can, in contemplation of law, enjoy a bad reputation separate and apart from that appended to its frequenters. After a consideration of the evidence, we think that such an enquiry is superfluous, it having been amply shown by the evidence that Mulkin was a man of violent and bloodthirsty reputation. On the night of his death, Mulkin was apparently in his place of business during the entire time from Metcalf's entry. The jury was adequately

instructed that Mulkin's violent reputation was an element in Metcalf's arming himself and taking other defensive precautions. Since the evidence failed to show any other source of danger than Mulkin, testimony as to the reputation of Johnnie's Place (if a place can have a reputation or if this be but a shorthand rendition for the character of those who frequent the establishment) was irrelevant.

Reputation or character, when relevant, is properly presented in evidence not in the form of discrete acts or traits of the person, but as the total image resulting from his life in a community, Shiflett v. State, 38 Ala.App. 662, 93 So. 2d 523. Specific acts of violence of a deceased in a homicide case are not admissible except as they may have been directed against the defendant, Holloway v. State, 38 Ala.App. 434, 89 So.2d 313. Therefore, Metcalf was not injured by the court's exclusions of Mulkin's various violences.

We have reviewed the entire record (Code 1940, T. 15, § 389) and find it free of any prejudicial error. Accordingly, the judgment below is

Affirmed.