202 So.2d 534

#### Franklin BEVERLY

#### v.

#### STATE.

#### 7 Div. 766.

Supreme Court of Alabama.

Sept. 14, 1967.

Irby A. Keener, Jr., Centre, for appellant.

MacDonald Gallion, Atty. Gen., and Robt. F. Miller, Asst. Atty. Gen., for the State.

HARWOOD, Justice.

This appeal is from a verdict and judgment of guilty of murder in the first degree. The defendant's punishment was fixed at imprisonment for life.

The evidence shows that the elderly victim of the murder, Andrew Bell, lived alone in a rural section of Cherokee County.

This appellant and Lee Elrod and Gene Womack entered into a plan and a conspiracy to rob Bell whom Elrod had known for several years.

On 28 July 1966, after two or three days of planning, the three conspirators drove to Bell's home where they stopped on the pretext of needing some gasoline.

Bell was coming from his barn when the trio arrived, and after perfunctory introductions by Elrod, he and Bell went into the house where they remained for about thirty minutes. Elrod then called to Womack and the appellant, asking if they wanted a drink. Bell then came out, got a bucket and drew some water. Elrod and Bell then went back into the house, and after a few minutes emerged. They were talking about guns.

Bell went to his yellow and white Ford automobile which was parked in his yard, and procured a shotgun. Elrod asked to try it out. Bell produced some shells and at Elrod's request placed a can in the road. Elrod shot at the can and then asked Bell to place it on a fence post. As Bell was walking away toward a fence post, Elrod shot him as he was near a pile of lumber. His fallen body was partly concealed by the lumber.

The three then ransacked Bell's house and took therefrom various items including some groceries, blankets, old coins, a guitar, and cigarettes. Elrod then went through Bell's pockets.

The stolen articles were loaded in Bell's automobile.

It also appears that Bell had removed the back seat from his automobile and had numerous articles stored in the car, including three guns, a guitar, and four violins. The trio started the engine of Bell's automobile by "straight wiring" it, and with the appellant driving and Elrod riding with him, they left Bell's place following Womack who drove his own automobile.

Womack, Elrod and the appellant later divided the loot thus obtained, and the appellant kept Bell's automobile. Several of the items thus obtained by the appellant were traced directly to him either through donees to whom he had given some of the items, or to purchasers or pawn brokers to whom he had sold or pawned Bell's property.

The appellant after several days obtained work at a filling station in Chattanooga, Tennessee.

At the time of the murder of Bell, the appellant was an escapee from the Cobb County, Georgia, Public Work Camp, where he was serving two sentences under a conviction for forgery.

On 22 August 1966, Paul Griffin, an agent for the Georgia Bureau of Investigation, went to Chattanooga searching for the appellant.

He found the appellant at the filling station and recognized him from a description and particularly from a tattoo of a woman and a wine glass on one of appellant's arms. He asked appellant if he was Franklin Beverly and received an affirmative answer.

Griffin then went to a nearby police headquarters and accompanied by a detective of the City of Cattanooga, returned to the filling station where the detective and Griffin purportedly arrested the appellant. At the time Griffin did not have a warrant of arrest, nor apparently did the detective.

After his "arrest" the appellant was searched and a bill of sale to Bell's automobile was found in his wallet. Also, at this time the appellant told Griffin he had his automobile parked at the filling station and requested Griffin to see that the automobile was returned to his (appellant's) wife. This automobile turned out to be Bell's, stolen at the time of his murder.

The appellant waived extradition and consented to return to Georgia. He was then taken to the Walker County, Georgia, jail.

In the meantime, Bell's body had been found by the sheriff of Cherokee County, Alabama, and the conditions indicating a robbery of his home observed. Sheriff Garrett of Cherokee County had issued a "pick up" request to surrounding areas for Bell's automobile. Upon examining this "pick up" request and comparing it with the automobile parked at the filling station by the appellant, it was noted that this automobile was the wanted Bell vehicle. Griffin then notified Sheriff Garrett of these findings.

A warrant charging the appellant with the murder of Bell was duly obtained in Cherokee County, Alabama, and the appellant was notified of this charge.

Some two or three days later, Alabama law enforcement officers went to Walker County, Georgia, and the Alabama warrant charging him with the murder of Bell was read to the appellant. He was then taken before a Superior Court judge and in open court expressed his desire to waive extradition to Alabama, and signed a waiver to that effect.

The appellant was then returned to the Walker County, Georgia, jail where he was interviewed by K. W. Combs, an Alabama State Investigator, Sheriff Garrett of Cherokee County, Alabama, and Paul Griffin, and Jack Knott, agents of the Georgia Bureau of Investigation.

Prior to this interview, the appellant was again informed of the murder charge against him. There was then read to the appellant what is designated a "Waiver of Counsel by Defendant in Custody" and as each paragraph was read, it was fully explained to the appellant. This waiver, signed by the appellant, reads as follows:

"I, Franklin Eugene Beverly, have been informed by the undersigned law enforcement officers, prior to being questioned by them, that I am suspected of the offense of Murder First degree in Cherokee County, Alabama, on the 28th day of July 1966, and have been informed by them of my rights as follows:

"1. That I may remain silent and do not have to make any statement at all.

"2. That any statement which I might make may be used against me in Court.

"3. That I have a right to consult with an Attorney before making any statement and to have such Attorney present with me while I am making a statement.

"4. That if I do not have enough money to employ an Attorney, I have the right to have one appointed by the Court to represent me, to consult with him before making any statement, and to have him present with me while I am making a statement.

"5. That if I request an Attorney, no questions will be asked me until an Attorney is present to represent me.

"After having my rights explained to me, I freely and voluntarily waive my right to an Attorney. I am willing to make a statement to the officers. I can read and write the English language and fully understand my rights to an Attorney. I have read this waiver of counsel and fully understand it. No threats or promises have been made to me to induce me to sign this Waiver of Counsel and to make a statement to the officers. This 26th day of August, 1966. Signed 'Franklin E. Beverly.' "

At the top of the waiver, in appellant's handwriting is the following:

"The below was read and explained to me and I understand it. Franklin E. Beverly."

In this interview the appellant made a full and detailed confession of the murder of Bell by himself and Womack and Elrod. Some of the facts as set forth above have been taken from this confession.

In the trial below this confession was offered in evidence. Upon defense objection that the same was not voluntary, the jury was excused and a voir dire examination of Combs and Sheriff Garrett was had, and the appellant also testified in this stage of the proceedings.

The testimony of the two officers was to the effect that the "Waiver of Counsel" had been read to the appellant paragraph by paragraph, with each paragraph being explained to the appellant as it was read. Before the appellant signed the waiver, Sheriff Garrett again asked him if he understood the meaning of the waiver and he said he did. The appellant then made an oral statement to the officers. Thereafter the statement was written out by Combs and read to the appellant who signed the same.

The appellant's testimony on voir dire in general fully corroborated the testimony of the officers. He stated that before the interview he was informed that he was charged with the murder of Bell. No statement or promise was made to him by the officers as to benefits to be obtained by cooperating with them nor was any coercion exercised in the premises. The appellant testified:

"After I gave a true statement they told me they would do everything they could for me. They didn't make me any promises."

The appellant further testified that the officer asked him to tell them what happened, and he did most of the talking thereafter. Coffee was brought in twice during the interview. After the written statement was signed by appellant, he told the officers it was a true statement and he told Sheriff Garrett he wanted to plead guilty to the murder charge and get a life sentence.

After the completion of the voir dire examination, the jury was returned to the box and the confession again was offered in evidence by the prosecution. Appellant's objection to the admission of the confession on the grounds that the same was not shown to be voluntary was overruled by the court, and the confession was received in evidence and read to the jury. Implicit in the court's ruling was a finding by the court that the confession was voluntary.

■ From a reading of this record, the conclusion is inescapable that during every phase of this investigation the officers participating therein were zealous in protecting all of the constitutional rights of this appellant. We hold that even under the far reaching requirements of Miranda v. State of Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694, no rights of the appellant were infringed, but on the other hand were fully protected at all times by the investigating officers. No error resulted in the admission of the confession.

■ In the proceedings below the appellant filed a motion to quash the indictment and a plea in abatement. The grounds of the motion and of the plea were to the effect that no women were on the jury rolls of Cherokee County at the time of the drawing of the Grand Jury. Counsel for appel-

lant contends that this systematic exclusion of women from the jury rolls at the time the Grand Jury was drawn, rendered the Grand Jury illegal, and hence the court erred in its rulings on the motion to quash and the plea in abatement.

The record shows that the Grand Jury which returned the indictment against the appellant was empanelled and sworn on 28 March 1966. It thereafter recessed until the fourth Monday in October, at which time it examined the Bell murder and returned the indictment against the appellant.

This appellant being a male was not a member of the group he contends was systematically excluded in selecting the Grand Jury. He is in no position to say he was denied a Grand Jury of his peers. *Philpot v. State*, 280 Ala. 98, 190 So.2d 291.

■ Over the appellant's objection there was received in evidence the bill of sale removed from appellant's wallet after his purported arrest at the filling station in Chattanooga. It is the contention of appellant's counsel that the arrest of the appellant was illegal in that neither officer had a warrant for appellant's arrest and therefore no derivative right to search appellant existed.

We see no need to belabor the legality of the arrest and ensuing search of appellant's person. This for the reason that the appellant in his confession recounted: "I went to Trenton every day for several days after we robbed the old man. I asked Sally" (Whited) "to type me a bill of sales. She printed the bill of sales with the Alabama tag. Several days later she typed a bill of sales with the Florida tag number. I got the Florida tag from a junk yard north of Trenton. I left the Alabama tag there. The Alabama tag was number 28–1920."

Thus appellant could not have probably been injured in any substantial right by the introduction of the bill of sale (the second one typed with the Florida tag number) in that this evidence related to evidence not only uncontradicted but fully corroborated by the appellant himself in his confession. Sup.Ct. Rule 45.

Over appellant's objection a photograph of the deceased taken as he was found lying in the woodpile, was received in evidence. The body was in an advanced stage of decomposition. Counsel for appellant argues that the photograph did not shed light on the material issues of the case and was prejudicial to appellant in the eyes of the jury.

■ The fact that a photograph is gruesome is no ground for excluding it from evidence, particularly where the gruesomeness results from the acts of the accused, and deterioration resulting from decomposition brought on by time, rather than from the unexplained act of some third party as in the performance of an autopsy. See *McKee v. State*, 33 Ala.App. 171, 31 So.2d 656. Further, the photograph tended to shed light on why no autopsy was performed immediately, and not until several weeks later when indications were developed that Bell's death resulted from a murder rather than natural causes. When Bell's body was disenterred and a full autopsy performed, it was found that his death resulted from shotgun pellets recovered from his heart, lungs, and other vital organs. No error resulted in the introduction of the photograph of Bell's body. *McKee v. State*, 253 Ala. 235, 44 So.2d 781; *Nichols v. State*, 267 Ala. 217, 100 So.2d 750.

Counsel for appellant also argues that the court erred in refusing to give to the jury his written requested charges Nos. 3 and 4. These charges are affirmative in nature as to murder in the first degree.

It is counsel's contention that the body found at the Bell homesite could not be identified from the photograph as being that of Bell. This argument overlooks the testimony of Sheriff Garrett that he viewed the body itself and from this examination (not from the photograph) he identified the body as that of Bell.

It is to be noted that other than in the voir dire stages of the trial below, the appellant did not testify. The evidence presented by the state is to all intents and purposes uncontradicted.

 From our study of this record, it is our conclusion that it is free of error probably affecting any substantial right of the appellant. We observe that the court-appointed counsel represented the appellant in a vigorous and highly competent manner. This is attested by the fact that the minimum sentence of life imprisonment was imposed by the jury when, under the evidence, that body would have been amply justified in imposing the death sentence in view of the atrociousness of the premeditated crime concocted, planned, and executed by the appellant and his two conspirators.

Affirmed.

LIVINGSTON, C. J., and MERRILL and COLEMAN, JJ., concur.