31 So.2d 656

## McKEE v. STATE.

5 Div. 237.

Court of Appeals of Alabama.

May 20, 1947.

Rehearing Denied June 24, 1947.

Omar L. Reynolds and Reynolds & Reynolds, all of Clanton, for appellant.

A. A. Carmichael, Atty. Gen., and John O. Harris, Asst. Atty. Gen., for the State.

HARWOOD, Judge.

This appellant was indicted for murder in the first degree of his wife Irene. He was by a jury found guilty of murder in the second degree, and his punishment fixed at imprisonment in the state penitentiary for a term of twenty years. His motion for a new trial being overruled appeal was duly perfected to this court.

The appellant, his wife, and five children lived in a small house near Jemison in Chilton County. The children were all boys, aged 10, 8, 6, 4, and 2 years, respectively. Mrs. McKee, the deceased, was fourteen weeks pregnant at the time of her death.

The alleged homicide occurred on the night of 19 June 1946, somewhere between 7:30 and 9 p. m. The evidence presented by the state was entirely circumstantial, and its tendency was as follows:

Several neighbors living within a quarter to a half mile of the McKee home testified that on the night in question and within the time period above mentioned they heard a woman scream from one to three times, the scream or screams coming from the direction of the McKee home. Very shortly after hearing these screams they heard appellant yelling to his neighbors, some saying they heard him call "Mr. Gore, go get a doctor, my wife is real bad off," and some heard him say "Lord have mercy she is done dead, come here quick."

Neighbors arrived at the McKee home in from fifteen to twenty minutes after hearing the screams and calls.

They found Mrs. McKee lying on a bed in the east front room apparently dead. She was clothed in a slip from her waist down, and a blanket had been placed over her. Her head and a pillow underneath were wet. The room adjoining on the west the room in which Mrs. McKee was lying was bare of all furnishings, this west room having been recently painted. Some one had, however, vomited just inside the door of this west room.

Some of the neighbors went over the McKee home. Their testimony is before us. No furnishings were anywhere disturbed, and no disorder of any sort was observed.

The appellant was present, dressed in work clothes, and all witnesses testified he appeared sober. To some witnesses he seemed nervous, to others no more nerv-

ous than one would ordinarily be under such circumstances.

Several of these witnesses testified that the appellant told them that after he returned from work he was on the back porch washing his feet and that his wife was in the room bare of furniture bathing from the waist up out of a boiler. She called to him to bring her a wet cloth as she was feeling ill. When he went to her he found she had fallen on the floor. He placed her on a bed, wet her face, and then sought aid.

The state stresses the point that there is a variance in the accounts given by appellant, in that he told one witness that his wife was dead when he found her, while he stated to another witness that his wife was not dead when he found her, and that after he had placed her on the bed she smiled at him and said "Honey, I am leaving you," while in a still different version one witness stated appellant had said he was on the back porch playing with a dog when his wife called to him.

The eldest son of the appellant, aged 10 years, testified for the state. His testimony was to the effect that on the day his mother died she had done the family washing, carrying tubs partially filled with water from the well to the place she did the washing. With the aid of this boy she had also sawed some wood that day, and late in the evening had picked blackberries with which she made a pie for supper. Several times during the day this witness observed Mrs. McKee catch her side and say it was killing her. This witness knew nothing as to the occurrences that may have happened just preceding his mother's death as he and all the other children were asleep.

He also testified that on the Monday morning before his mother died on Wednesday he observed his father and mother quarrelling because his father (appellant) had been away from home the night before, and during this quarrel appellant threw a plate of grits at the deceased, but it missed hitting her. Being recalled by the defense this witness recanted this portion of his testimony. The weight of his entire testimony, including the recantation, was for the jury.

As to marks, bruises, etc., on the deceased when observed after her death on the night in question Mrs. Alice Gore testified she saw a scratch on the lip of the deceased, and two small bruises on her arm.

Mrs. Davenport watched the other ladies dress the body of deceased before it was taken away by the undertaker. She observed no marks on the body whatsoever.

Mrs. Alex Bolton assisted in dressing the body, and also arranged the deceased's hair. She saw no bruises on the body except the scratch on the lip. After the body was returned from the undertaker she saw a "place" on the right temple that was already scabbed over.

Mrs. Ruby Maynard who also assisted in dressing the body noticed only a scratch on deceased's lip, which she had seen on deceased while she was alive.

Bob White, the undertaker, who embalmed the deceased observed the bruises on the arm, the scratch on the lip, and a small place on the temple about one half the size of his little finger nail, which place on the temple had already scabbed over.

The testimony of Dr. Rehling, State Toxicologist, was the most significant presented by the state. Dr. Rehling testified that on 27 June 1946, some eight days after her death, he disinterred Mrs. McKee's body and performed an autopsy thereon. His dissection was confined to the chest and abdominal cavities. Prior to dissection the the body bore a number of bruises and abrasions, one being the left center of the forehead at the hair line, dark in color and about one and one half inches in diameter; there was a skin abrasion about one inch long and a quarter of an inch wide just forward of the right ear; there were a number of spot bruises on the outer aspect of the upper right arm; a group of three skin abrasions on the upper left shoulder blade area, about one eighth to three eighths of an inch wide and a quarter of an inch in length; brush marks or scratches on the right leg just below the knee; at the base of the shin was a bruise; at the base of the left hip was a bruise about two or three inches in length. Under the area of this last bruise was located the spleen.

Upon opening the abdominal cavity Dr. Rehling found that Mrs. McKee's spleen was enlarged about three times its normal size. Dr. Rehling stated that the spleen is a spongy substance, and a very tender organ in normal state. When enlarged from disease it is still more friable. He found that the spleen had been ruptured, there being a tear in it about one and one half inches long. This rupture would cause excruciating pain, vomiting, and an internal hemorrhage which would result in death within thirty minutes.

Dr. Rehling gave as his opinion that Mrs. McKee had died as a result of this ruptured spleen, and that said rupture had resulted from an external blow.

During Dr. Rehling's testimony, and after he had testified in detail as to the physical condition of Mrs. McKee's body at the time of his autopsy thereon, particularly as to the spleen and its condition, the state, over the strenuous objections of the defense, introduced several photographs of the body taken by Dr. Rehling and developed under his direction. We will refer later to this phase of the evidence.

Testifying in his own behalf in the trial below the appellant stated that on returning to his home late on the afternoon of the day on which his wife died he found that his family had already eaten supper. He told his wife he was going to kill a small dog belonging to his children as the dog had been ill tempered since having its leg broken sometime before and had bitten several of the children. His wife protested, and as he did not desist she yelled several times. Seeing his wife was so upset he did abandon his plan to kill the dog. As they were walking back into the house his wife stumbled and fell as she was picking up some wood. She got up and they went from the back yard to the house. His wife went into the house to take a bath and he remained on the back porch to wash his feet. While so engaged his wife called to him to bring her a wet cloth as she was ill. He found a cloth and ran to his wife, finding her lying on the floor. He placed her on a bed, got a pail of water and poured it on her head in an attempt to revive her. He then ran to where his children were

sleeping, waked the two eldest and sent them to tell a neighbor to summon a doctor. He then ran out of the house and called to his neighbors for help. In some ten or fifteen minutes his neighbors began arriving, and eventually a doctor. The doctor pronounced Mrs. McKee dead, either from heart trouble or indigestion.

The appellant denied he had struck his wife in any manner, and asserted that they had gotten along as well as the average couple, particularly for the past several years. He admitted that he and his wife had had a quarrel on the Monday morning before her death, saying he had driven his employer to Birmingham on Sunday and had been detained, not returning home until the next morning. His wife was quarrelling because of this overnight absence, and during the quarrel he threw a plate of grits at her, which missed hitting her.

■ We have set out the above facts probably to a tedious length as the appellant's counsel argues strenuously that the court erred in refusing appellant's written request for the affirmative charge, and denying his motion for a new trial, because of the failure of proof of the corpus delicti in this case. Under the above facts it is our opinion that the court's actions in the above premises were correct.

■ The above facts show Mrs. McKee's death, that appellant was the last person with her while she lived, and facts from which the jury could reasonably infer appellant's agency in the production of her death. The corpus delicti may be established by circumstantial evidence, and may be shown by evidence from which only a reasonable inference that the offense has been committed may be drawn, the facts and circumstances being considered together. DeSilvey v. State, 245 Ala. 163, 16 So.2d 183; Warren v. State, 32 Ala.App. 273, 25 So.2d 51; Kozlowski v. State, 32 Ala.App. 453, 27 So.2d 811.

We now consider the court's ruling in admitting in evidence over appellant's objection certain photographs taken by Dr. Rehling of deceased's body during his autopsy operations. These photographs are before us as State's Exhibits E, F, G, H, I, and J. The grounds of the objection interposed

were as follows: "It is not shown that the body was in the same condition at the time the photograph was made as it was at the time of death; on the further grounds it is not material in the case in that the evidence has otherwise been shown by oral testimony; on the further grounds it is calculated to prejudice the Defendant in the eyes of the Jury; it sheds no light on the issues in the case in addition to what has otherwise been shown; on the further ground that the picture shows parts of the body about which there is no dispute."

Exhibit "E" is a photograph taken from the left side, and includes that portion of deceased's body from the neck to about midway of the thigh. It was introduced in connection with the bruises appearing at the crest of the left hip and the bruise over the spleen.

Exhibit "F" is a photograph of the deceased's body taken, from the right side. It includes the entire body from the head to a point about midway of the thighs, with a sheet partially draped over the lower extremity. According to Dr. Rehling this picture shows particularly the bruises on the upper right arm.

Exhibit "G" is a photograph of deceased's body from about midway of the thighs to the feet. Again according to Dr. Rehling it displays the brush mark on the right shin below the knee.

Exhibit "H" is a photograph of deceased's head and shoulders, the right breast being included. It was introduced to show the bruise on the left forehead at the hair line.

Exhibit "I" is a picture of deceased's body turned on its right side. It includes the entire nude body of deceased from the head to about midway of the calves of the legs. It shows the bruises on the left side, the bruise at the base of the spine, and the abrasions in the left shoulder blade area.

Exhibit "J" is a photograph of deceased's body after dissection. It shows deceased's body from the upper forehead to a point about midway of the hips. The body is lying on its back. The torso has been opened, the lower line of the dissection being at about a line drawn from the crest of the hipbones and extending to a depth of about two thirds of the body. The incision then extends up the body to a point close to the arm pits. The thick flap of skin and fascia thus created has been thrown back covering deceased's face. The inner vitals of deceased are exposed in the large area thus uncovered. Five streams of dark fluid, we presume blood, are running down the uncut portion of the torso. The picture further shows a robed figure back of the body with rubber gloved hands pushed into the vitals so as to disclose a dark object which we know from Dr. Rehling's testimony to be the spleen. On this organ there is a dark line which is the rupture. However another dark line of less width extends diagonally across the spleen. This we assume is blood. The spleen constitutes a very, very, small portion of the whole picture.

All of the above photographs are of course unpleasant. This last exhibit we think may appropriately be catalogued as ghastly. Grewsomeness is however no grounds for excluding this type of evidence (photographs, clothing, etc.) if it has a "reasonable tendency to prove or disprove some material fact in issue, or which at the time appeared to be probably in dispute or material" (Grissett v. State, 241 Ala. 343, 2 So. 2d 399, 401), and if it illuminates the issues in any way, and is relevant, it is admissible even though possessing a tendency to inflame the minds of the jury. Grissett v. State, supra. Or, as stated by Chief Justice Anderson in Boyette v. State, 215 Ala. 472, 110 So. 812, the admissibility of this type of evidence is dependent on whether it has "some tendency to shed light upon some material inquiry."

The fact that such pieces of evidence are merely cumulative of detailed oral testimony does not affect their admissibility. Wilson v. State, 31 Ala.App. 21, 11 So.2d 563; Weems v. State, 222 Ala. 346, 132 So. 711; Stallings v. State, 249 Ala. 1, 32 So.2d 233.

The following cases deal with the admission of photographs, and enunciate some or all of the principles set forth above. Birmingham Baptist Hospital v. Blackwell, 221 Ala. 225, 128 So. 389; Vaughn v.

State, 236 Ala. 442, 183 So. 428; Grissett v. State, 241 Ala. 343, 2 So.2d 399; Wilson v. State, 31 Ala. App. 21, 11 So.2d 563, certiorari denied 243 Ala. 671, 11 So.2d 568; Rowe v. State, 243 Ala. 618, 11 So.2d 749; DeSilvey v. State, 245 Ala. 163, 16 So.2d 183; Wesley v. State, 32 Ala. App. 383, 26 So.2d 413.

In all of the above cases the photographs were made of the bodies in their unchanged condition, except as the wounds inflicted by the defendant, or acts done by him, may have wrought or caused such change.

Such grewsomeness as may have been pictured resulted from the defendant's own acts. Causing such results he was in no position to complain that they were pictured.

Even so, the body areas shown in the photographs held admissible in some of the previous cases were limited, for in the Wilson case, supra, the pictures were of "that portion of the deceased's body where the bullet wounds appeared." [31 Ala. App. 21, 11 So.2d 566.] In Birmingham Baptist Hospital v. Blackwell, 221 Ala. 225, 128 So. 389, 390, the only photograph whose admission was approved was "of the wound only, and embraces that portion of the body necessary for its inspection and no more."

█ In the present case the ghastliness of Exhibit "J" resulted in a large degree, not from the act of this defendant, but from the dissection necessary in the autopsical operation. Conceding the relevancy in evidence of pictures of injured vital organs, which injuries allegedly caused the deceased's death, yet we are clear to the conclusion that such photographs should be limited to such organs and only so much of the surrounding body as may be necessary to illustrate the organ and its injuries. Where, as in this case, massive mutilation of a body is necessary to expose such injured organ, fairness to an accused demands that only so much of the surrounding dissected body area be pictured as is reasonably necessary to furnish visual aid to the jury in determining the question of facts presented.

We cannot see that any unreasonable hindrance is cast upon the prosecution by the above rule of evidence, which rule is, in our opinion necessary if an accused is to be tried only upon facts material and relevant to the real issue of his guilt, and if his trial is to be imbued with that degree of fairness fundamental and inherent in our common law judicial processes.

█ In the present case the evidence presented by the state was entirely circumstantial, and the defendant's conviction rested on inferences drawn by the jury from such circumstantial evidence. It is of particular importance in this type of case that all evidence tending to inflame the minds of the jurors, or to distract their attention from the issues involved be kept at a minimum. While fully adhering to the principle that much must be left to the sound discretion of the trial judge in questions of this sort we are strongly of the opinion that there was an abuse of discretion on the part of the trial court in admitting into evidence State's Exhibit "J". and that the defendant was materially injured in his substantial rights by such admission.

Appellant's counsel argues strenuously that the court erred in refusing defendant's requested written charges to the effect that if the jury believed the evidence in this case it could not find the defendant guilty of either degree of murder. The appellant was found guilty of murder in the second degree. Counsel argues that there was no evidence from which malice an essential element of murder in the second degree could be inferred, since there was no evidence to show the use of a deadly weapon.

█ While the intentional use of a deadly weapon raises a presumption of malice, the absence of such presumption in no way prevents the finding of malice, and all the other elements of murder in either degree if reasonably inferable from all the facts and circumstances in evidence. Oliver v. State, 234 Ala. 460, 175 So. 305. In our opinion the facts in this case justified the submission of all degrees of homicide to the jury.

Concluding that the admission of State's Exhibit "J" necessitates a reversal of this case we have not written to several other propositions assigned and argued by appellant's counsel as error in this case, be-

ing of the opinion that there is little likelihood that such points will occur in a new trial of this cause.

Reversed and remanded