[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 958 
Emanuel Aaron Gissendanner, Jr., was indicted on three counts of capital murder and one count of possession of a forged instrument. Count I of the indictment alleged that Gissendanner murdered Margaret *Page 959 
Snellgrove by inflicting head and neck injuries and that he did so during the course of a rape, § 13A-5-40(a)(3), Ala. Code 1975. Count II alleged that Gissendanner murdered Snellgrove during the course of a kidnapping, § 13A-5-40(a)(1), Ala. Code 1975. Count III alleged that Gissendanner murdered Snellgrove during the course of a robbery, § 13A-5-40(a)(2), Ala. Code 1975. A separate indictment charged Gissendanner with possessing or uttering a forged check drawn on Snellgrove's bank account, in violation of § 13A-9-6, Ala. Code 1975. Following a jury trial, held on August 13, 2003, through August 16, 2003, Gissendanner was convicted of the two counts of capital murder — charging murder during the course of a robbery and murder during the course of a kidnapping — and possession of a forged instrument; the jury found him not guilty of murder made capital because it was committed during the course of a rape. The trial court held a sentencing hearing before the jury, and the jury recommended, by a 10-2 vote, that Gissendanner be sentenced to death. On December 19, 2003, after a separate sentencing hearing before the court, the judge sentenced Gissendanner to death on the capital-murder convictions. The trial court also sentenced Gissendanner, a habitual offender, to life imprisonment for the forgery conviction. On January 12, 2004, Gissendanner filed a motion for a new trial. After a hearing on February 11, 2004, the trial court denied the motion. This appeal follows.
The trial court's sentencing order contains a detailed summary of the relevant evidence presented in this case. We adopt the trial court's findings as our own and will include additional facts to the extent necessary to resolve the issues presented on appeal. The trial court's December 19, 2003, order states, in pertinent part:
"On Friday, June 22, 2001, [Gissendanner] intentionally caused the death of Margaret Snellgrove by inflicting severe head and neck injuries to her. The assault occurred at the victim's home. On Saturday, June 23, 2003, neighbors and relatives became concerned about the victim, as she could not be located. She had missed several appointments on June 22nd and on June 23rd. She was last seen June 21, 2001. The police were contacted and examination of the victim's home revealed that she had been assaulted in her carport. Hair and blood, as well as the victim's broken glasses and an earring were discovered in the carport. The victim's car, a 1998 Oldsmobile Ninety-Eight, was missing. No one witnessed the assault and there is no evidence of an accomplice in the case. [Gissendanner] had been to the victim's residence previously. He helped witness Reverend David Brown with yard work at her house for about three hours in March or April, 2001.
"A witness testified that she saw a black guy driving an automobile matching the description of the victim's car at approximately 6:30 a.m. on the morning of June 22nd.[2] The location where the witness saw the automobile was in close proximity to the victim's home. The witness could not identify the driver as [Gissendanner], but her attention was drawn to the vehicle because her sister-in-law had an automobile that looked the same.
"On the morning of June 22nd, [Gissendanner], driving the victim's vehicle, picked up his best friend, Bernard Campbell, nicknamed `Nobbie,' and they went to Clio. [Gissendanner] told Nobbie that the car belonged to one of his girl-friends. In Clio [Gissendanner], driving the victim's automobile, picked up three females who knew both [Gissendanner] and Nobbie, and they rode around, *Page 960 
drank beer, and smoked weed. [Gissendanner] was wearing a brown pair of Dickey pants, a red shirt and a white tee shirt. [Gissendanner] told the females that he had bought the car from an `old white woman.' They all noticed a Bible in the car.[3]
"Queen Esther Morris testified that she saw [Gissendanner] the morning of June 22nd in the victim's car. [Gissendanner] told Morris that he was going fishing.
"Around 1:00 a.m. the morning of June 23rd the victim's automobile was reported abandoned on property owned by Linda Russell. Upon checking the license plate it was confirmed to be the victim's missing automobile.[4] [Gissendanner] testified that the automobile was rented to him by an individual named Buster he saw early Friday morning who was looking to buy some drugs. [Gissendanner] further testified that Buster gave him a check on the victim's account, asked him to cash it and said he would use the proceeds to buy drugs from [Gissendanner].
"Following the discovery of the victim's automobile, law enforcement began a search and investigation in the area for the victim's body. The car was examined and blood was discovered in the trunk of the car, on the underside of the trunk lid. The blood was later determined to be that of the victim.
"Investigators searched a nearby abandoned trailer in which [Gissendanner] sometimes stayed. In the trailer they found several items belonging to the victim including a cell phone, the victim's purse and some papers taken from the stolen vehicle. Investigators also found some of [Gissendanner's] clothing in the trailer which matched the description of the clothing [Gissendanner] was wearing on Friday morning during his trip to Clio. The victim's bloodstains were found on the clothing.
 "On Saturday evening, June 23rd, [Gissendanner] paid his former wife $100.00 to drive him to Montgomery to visit his sister. She did so. [Gissendanner] was there in Montgomery when he was identified as a suspect, and he returned voluntarily to the Ozark Police Department, where he was questioned. He denied any involvement in the death of the victim, but admitted to driving her automobile and cashing the victim's check at the SouthTrust Bank in Ozark.
 "The body of Margaret Snellgrove was found with the use of a cadaver dog on June 27, 2001, near the area where the automobile was found abandoned and near the trailer where [Gissendanner's] clothes and the victim's belongings were found. The body was found in a ditch covered with tree limbs.[5] It appeared to have been there for several days and was badly decomposed. An autopsy determined that Margaret Snellgrove died of severe head and neck injuries. When the body was found she was in her panties with her shirt and brassiere pulled up under her arms. Her breasts were exposed."
(C. 140-43.)
 I.
Gissendanner first argues that the trial court erred when it denied the motion *Page 961 
he made pursuant to Batson v. Kentucky, 476 U.S. 79,106 S.Ct. 1712, 90 L.Ed.2d 69 (1986); in his motion Gissendanner had argued that the venire should be quashed because the prosecutor exercised peremptory strikes to remove six of nine blacks from the venire. He also argues on appeal that the trial court erred when it failed to require the prosecutor to give his reasons for his strikes. Gissendanner has not identified any specific juror who he says was erroneously struck. The State argues that the trial court correctly denied Gissendanner'sBatson motion because he failed to make a prima facie showing that the prosecutor had exercised his peremptory challenges in a discriminatory manner and that, because Gissendanner failed to establish a prima facie case, the prosecutor was not required to state reasons for his strikes. We agree with the State.
After the parties struck the jury, Gissendanner made aBatson motion. He listed the numbers of the black venire-members struck by the prosecutor and stated:
 "Of the nine [black veniremembers] that were left on the venire, he struck six, which is 66 percent of those. There are three left on this panel we're fixing to put in; that would be about 25 percent of the 12 members. We'd submit that he exercised those just based on the numbers how he did it — 5, 6, 7, 8 and 9 — was in a racially discriminatory manner, Your Honor."
(R. 795.)
The trial court asked Gissendanner whether he had anything else to support his Batson motion; Gissendanner replied that he had nothing else. The court then determined that Gissendanner had failed to establish a prima facie case of discrimination. The court initially indicated that it would require the prosecutor to state his reasons for his strikes, but after the prosecutor objected and the parties presented arguments to the court, the court determined that the prosecutor would not be required to give reasons for his peremptory strikes. The trial court's ruling was correct.
This Court has previously addressed the claim now raised. InWimberly v. State, 931 So.2d 60 (Ala.Crim.App. 2005), defense counsel made a Batson motion based solely on the numbers of black jurors who were struck from the venire. The trial court denied the motion without requiring the prosecutor to give his reasons for his strikes. In Wimberly we stated:
 "'The party claiming a Batson violation must first establish a prima facie case of discrimination before the other side is required to state its reasons for its peremptory strikes.' Woods v. State, 845 So.2d 843, 844 (Ala.Crim.App. 2002). As this Court stated in McElemore v. State, 798 So.2d 693, 696 (Ala.Crim.App. 2000):
 "`Procedurally, the party alleging racial discrimination in the use of peremptory challenges bears the burden of establishing a prima facie case of discrimination. Ex parte Branch, 526 So.2d 609, 622 (Ala. 1987). "'[I]t is important that the defendant come forward with facts, not just numbers alone, when asking the [trial] court to find a prima facie case'" of racial discrimination. Mitchell v. State, 579 So.2d 45, 48 (Ala.Cr.App. 1991), cert. denied, 596 So.2d 954 (Ala. 1992), quoting United States v. Moore, 895 F.2d 484, 485 (8th Cir.1990).'
 "Clearly, Wimberly failed to establish a prima facie case of racial discrimination because he relied solely on the number of blacks that had been struck by the State."
931 So.2d at 64.
The Alabama Supreme Court and this Court have consistently held that numbers *Page 962 
alone cannot establish a prima facie case of discrimination in jury selection. For example, in Williford v. Emerton,935 So.2d 1150, 1157 (Ala. 2004), the Alabama Supreme Court stated:
 "This Court has repeatedly listed the different ways a party can establish a prima facie case of discrimination for purposes of a Batson
claim; however, the Willifords instead relied upon `numbers alone.' For that reason, the trial court properly determined that the Willifords had not established a prima facie case and denied their Batson motion without requiring the Emertons to provide race-neutral reasons for their strikes."
See also Blackmon v. State, [Ms. CR-01-2126, Aug. 5, 2005] ___ So.2d ___, ___ n. 2 (Ala.Crim.App. 2005)("Numbers alone are not sufficient to establish a prima facie case of discrimination. The circuit court could have properly denied Blackmon'sBatson motion without hearing the State's reasons for removing the black prospective jurors. Sharrief v. Gerlach,798 So.2d 646 (Ala. 2001).").
Gissendanner based his Batson motion entirely on the numbers of black venire-members struck and the number of blacks who remained on the jury. The trial court's denial of theBatson motion without requiring the prosecutor to give reasons for his strikes was consistent with established Alabama law. No error occurred, and Gissendanner is not entitled to any relief on this claim.
 II.
Gissendanner next argues that the trial court erred when it allowed Paula Link, Margaret Snellgrove's niece, to read a victim-impact statement to the jury during the sentencing phase. In his short discussion of this claim of error, Gissendanner cites McGahee v. State, 554 So.2d 473 (Ala. 1989), and argues that the statement "so infected the trial with unfairness as to make the resulting sentence a denial of due process as guaranteed under the law." (Appellant's brief at 21-22.) The State argues that victim-impact evidence may be presented during the penalty phase of a capital-murder trial so long as the witness does not recommend an appropriate. punishment or characterize the crime or the defendant. We agree with the State.
During the penalty phase of Gissendanner's trial, the victim's niece, Paula Link, was called to testify for the State. Gissendanner informed the court that he needed to raise an issue outside the hearing of the jury, so the court excused the jury. The prosecutor asked Link to read the statement she had prepared so that Gissendanner could hear its contents. Link stated:
 "Okay. I'm here to describe to you the impact Margaret Snellgrove's death has had on our family. Margaret had no children. But the close relationship that my sister, Kathy, and I have had with her all our lives became even closer during the 30 years since our own mother's death. Because Aunt Margaret is gone, our family no longer gathers in her home for Christmas. She was the matriarch of our family, a steadying influence. She was gracious and loving and we miss her presence.
 "Margaret's only sibling is a brother with limited mental capability. It takes all of his resources to cook and clean for himself. Because Margaret is gone, I drive over a hundred miles to his home once a week and spend the day taking him shopping and to conduct business. If he has doctors' appointments, I or a neighbor must provide transportation. I balance his checkbook, and his social interactions are severely curtailed because Margaret no longer can make her *Page 963 
customary twice-weekly trips to his home. Margaret was the heart of our family and that heart has been stilled."
(R. 1587-88.) Gissendanner then objected to a portion of the statement only, stating, `Tour Honor, we would object to the last sentence or two," and specifically referred to Link's statements about having to drive more than 100 miles to take care of the victim's brother. (R. 1588.) Gissendanner argued that the inconvenience associated with having to take care of another person was beyond what was intended for a victim-impact statement. (R. 1588-90.) The trial court overruled the objection, and Link read the statement to the jury.
In his brief on appeal, Gissendanner appears to object to Link's entire statement. At trial, however, he objected only to the final portion of the statement that referred to the inconvenience of caring for Snellgrove's brother. We will review the latter portion of the statement for error, and the remainder of the statement for plain error. Rule 45A, Ala. R.App. P., provides that in cases in which the death penalty has been imposed by the trial court, this Court "shall notice any plain error or defect in the proceedings under review, whether or not brought to the attention of the trial court, and take appropriate appellate action by reason thereof, whenever such error has or probably has adversely affected the substantial right of the appellant." "Plain error" is error that is so obvious that the failure to notice it would seriously undermine the integrity of the judicial proceedings and would result in a miscarriage of justice. E.g., Scott v. State, 937 So.2d 1065, 1082
(Ala.Crim.App. 2005). No error or plain error occurred as a result of Paula Link's testimony.
In Payne v. Tennessee, 501 U.S. 808, 111 S.Ct. 2597,115 L.Ed.2d 720 (1991), the United States Supreme Court overruled two cases that had held that victim-impact evidence and argument could not be presented during the penalty phase of a capital-murder trial: Booth v. Maryland, 482 U.S. 496, 107 S.Ct. 2529,96 L.Ed.2d 440 (1987), and South Carolina v. Gathers,490 U.S. 805, 109 S.Ct. 2207, 104 L.Ed.2d 876 (1989). The Court held:
 "[A] State may properly conclude that for the jury to assess meaningfully the defendant's moral culpability and blame-worthiness, it should have before it at the sentencing phase evidence of the specific harm caused by the defendant. `[T]he State has a legitimate interest in counteracting the mitigating evidence which the defendant is entitled to put in, by reminding the sentencer that just as the murderer should be considered as an individual, so too the victim is an individual whose death represents a unique loss to society and in particular to his family.' Booth, 482 U.S., at 517 (White, J., dissenting) (citation omitted). By turning the victim into a `faceless stranger at the penalty phase of a capital trial,' Gathers, 490 U.S., at 821
(O'Connor, J., dissenting), Booth deprives the State of the full moral force of its evidence and may prevent the jury from having before it all the information necessary to determine the proper punishment for a first-degree murder."
501 U.S. at 825, 111 S.Ct. 2597.
The portion of Link's statement to which Gissendanner objected at trial included the "specific harm" suffered by the family as a result of the victim's death. The trial court committed no error when it denied Gissendanner's objection to that portion of the statement. To the extent that Gissendanner objects on appeal to the remaining portion of Link's statement, we find no plain error. Link's statement addressed the loss to the family resulting from her aunt's death; it did not characterize the *Page 964 
crime or recommend an appropriate punishment.
Gissendanner is not entitled to relief on this claim.
 III.
Gissendanner next argues that the trial court erred to reversal when it allowed victim-impact testimony at the guilt phase of his trial. Specifically, he argues that the jury should not have been permitted to hear Paula Link's testimony about the victim's life. The State argues that the testimony did not constitute victim-impact testimony, so the trial court did not err when it allowed the jury to hear it.
Gissendanner objects to the testimony of Paula Link. Link, the victim's niece, was the prosecution's first witness at the guilt phase. She testified that she and her sister had spent many nights with Snellgrove when they were growing up and that Snellgrove was living alone at the time of her death. Link testified that Snellgrove helped care for her mentally-challenged brother. She testified that Snellgrove attended church regularly and that she often carried a Bible with her in her vehicle. Link and her sister drove to Ozark, Alabama, on June 23, 2001. They had planned to attend a family reunion, but were told by a friend that Snellgrove had missed an appointment earlier that day and had not answered her telephone the previous day, so they drove to her house. Link and her sister looked in the windows of Snellgrove's house and saw her cat inside the house; nothing was out of order. They also observed that one of Snellgrove's cars was gone and the lock to the garage was hanging as Snellgrove often left it, so they assumed that Snellgrove had already departed for the family reunion.
Link testified that she and her sister drove to their uncle's house; their uncle was Snellgrove's mentally challenged brother, and they expected to see Snellgrove at his house. Link testified that her uncle liked established routines, so Snellgrove had established regular routines with him. Because Snellgrove did not arrive at the scheduled time, Link's uncle became increasingly agitated, and Link and her sister became concerned. They drove to the reunion and discovered that Snellgrove was also not there, so they returned to Snellgrove's house immediately. They asked a neighbor who had a key to enter Snellgrove's house. The neighbor discerned that Snellgrove's elderly cat had not had its medication and administered the necessary medication, but nothing else in the house was out of order, Link testified. Link said that they contacted the police because they did not know where Snellgrove had gone. Link then testified about the investigation, and she identified crime-scene photographs and other evidence.
Only after Link had testified as set out above did Gissendanner object. Furthermore, at that time, Gissendanner objected to Link's identification of Snellgrove's personal property that was discovered during the investigation of the murder; he argued that the items had no probative value. The prosecutor argued that some of the items had been found near Snellgrove's body and others had been found in the abandoned trailer where Gissendanner had been staying. The trial court overruled the objection. Gissendanner next argued, "And any evidence of family impact on the victim's family is arbitrary and capricious, and it plays on the passions of everybody, Judge. And that's very, very improper, and it violates his due process right under the Constitution, Your Honor, any family-impact-type evidence at all." (R. 860-61.) The trial court overruled that objection. *Page 965 
Although we find it unclear from Gissendanner's brief what part of Link's testimony he now claims the trial court erroneously permitted, we interpret his argument to be that testimony about Snell-grove living independently, helping her mentally challenged brother, carrying a Bible in her vehicle, and having an elderly cat that required medication was improper because, he says, it constituted victim-impact testimony. To the extent Gissendanner objected to this testimony, his objection was untimely because it was made long after the testimony was given. Therefore, we now review his claim for plain error. Rule 46A, Ala. R.App. P.
 "It is well settled that victim-impact statements `are admissible during the guilt phase of a criminal trial only if the statements are relevant to a material issue of the guilt phase. Testimony that has no probative value on any material question of fact or inquiry is inadmissible.' Ex parte Crymes, 630 So.2d 125, 126 (Ala. 1993), citing Charles W. Gamble, McElroy's Alabama Evidence, § 21.01 (4th ed.1991). However, `when, after considering the record as a whole, the reviewing court is convinced that the jury's verdict was based on the overwhelming evidence of guilt and was not based on any prejudice that might have been engendered by the improper victim-impact testimony, the admission of such testimony is harmless error.' Crymes, 630 So.2d at 126."
Jackson v. State, 791 So.2d 979, 1011
(Ala.Crim.App. 2000).
Link's testimony was not victim-impact testimony; rather, the testimony detailed events and actions leading to the discovery that a crime had been committed and to the eventual discovery and identification of Snellgrove's body and her personal items. We have previously held that such testimony is not victim-impact testimony and is, therefore, admissible at the guilt phase of a capital trial. Turner v. State, 924 So.2d 737, 770
(Ala.Crim.App. 2002). In Turner, the appellant argued that the prosecutor's comments about testimony regarding the thoughts, actions, and observations of the victim's daughter leading up to the discovery of the victim's body were improper victim-impact statements. We held that the comments were proper because they were based on the daughter's testimony about events leading up to the discovery of her mother's body. We also noted, "Victim-impact statements typically `describe the effect of the crime on the victim and his family.' Payne v.Tennessee, 501 U.S. 808, 821 (1991)." 924 So.2d at 770. Like the testimony in Turner, the testimony from Link about her efforts to locate her aunt, including her visit to her uncle's residence and his response to her aunt's un-characteristic departure from her routine and her observations about Snellgrove's cat were not victim-impact statements. The testimony described events leading up to the determination that Snellgrove was missing and that the police should be notified, and the testimony was relevant to identifying when and under what circumstances Snellgrove might have left her house. Testimony that Link and her sister spent time with Snellgrove was relevant to establish that Link was familiar with Snellgrove's house and her habits and that she was also aware of Snellgrove's deviations from her established patterns. No plain error occurred as a result of the foregoing testimony being presented during the guilt phase of the trial.
Testimony about the personal items that belonged to the victim and were recovered or seen by other witnesses in her car, in the abandoned trailer where Gissendanner had been staying, and near her body was properly admitted and relevant to establishing elements of the crime *Page 966 
and identifying Gissendanner as the perpetrator. That testimony also was not victim-impact testimony; no plain error occurred when that testimony was allowed.
Link's testimony that Snellgrove had no children does not appear to have been relevant to any issues related to whether Gissendanner murdered Snell-grove and was arguably irrelevant. It does not, however, constitute improper victim-impact testimony and we cannot find that plain error occurred as a result of that testimony. Even if the brief statement could be considered to be victim-impact testimony, we would not reverse Gissendanner's convictions and death sentence. The Alabama Supreme Court has considered a case with similar testimony, and it stated:
 "We agree with [the appellant] that [the victim's husband's] testimony concerning [the victim's] children, their ages, and the status of their custody after the murder was not relevant with respect to the question of his guilt or innocence and, therefore, that it was in-admissible in the guilt phase of the trial. The only issue before the jury during the guilt phase of the trial was whether [the appellant] had robbed and killed [the victim]. However, in Ex parte Crymes, 630 So.2d 125 (Ala. 1993), a plurality of this Court held in a capital murder case in which the defendant was sentenced to life imprisonment without parole that a judgment of conviction can be upheld if the record conclusively shows that the admission of the victim impact evidence during the guilt phase of the trial did not affect the outcome of the trial or otherwise prejudice a substantial right of the defendant. See, also, Giles v. State, 632 So.2d 568
(Ala.Crim.App. 1992), aff'd, 632 So.2d 577 (Ala. 1993), cert, denied, [512] U.S. [1213], 114 S.Ct. 2694, 129 L.Ed.2d 825 (1994); Ex parte Parker, 610 So.2d 1181
(Ala. 1992), cert. denied, [509] U.S. [929], 113 S.Ct. 3053, 125 L.Ed.2d 737 (1993); Lawhorn v. State, [581 So.2d 1159 (Ala.Crim.App. 1990)]; Hooks v. State, 534 So.2d 329
(Ala.Crim.App. 1987), aff'd, 534 So.2d 371 (Ala. 1988), cert. denied, 488 U.S. 1050, 109 S.Ct. 883, 102 L.Ed.2d 1005 (1989); and Ex parte Whisenhant,
[555 So.2d 235 (Ala. 1989)], applying a harmless error analysis in death penalty cases. Our review of the record indicates that [the appellant's] attorneys did not object to [the victim's husband's] brief references to [the victim's] children or ask him any questions on cross-examination. The trial court clearly instructed the jury that it had to determine, based on all of the evidence, whether [the appellant] had robbed and killed [the victim]. The jury was instructed that it could not find [the appellant] guilty unless the prosecutor had established his guilt beyond a reasonable doubt. The jury was also instructed not to let sympathy or prejudice affect its verdict. We caution prosecutors that the introduction of victim impact evidence during the guilt phase of a capital murder trial can result in reversible error if the record indicates that it probably distracted the jury and kept it from performing its duty of determining the guilt or innocence of the defendant based on the admissible evidence and the applicable law. However, after examining the record in its entirety, we conclude that the aforementioned portions of [the victim's husband's] testimony, although they should not have been permitted, did not operate to deny [the appellant] a fair trial. It is presumed that jurors do not leave their common sense at the courthouse door. It would elevate form over substance for us to hold, based on the record before us, that [the appellant] did not receive a fair trial *Page 967 
simply because the jurors were told what they probably had already suspected — that [the victim] was not a `human island,' but a unique individual whose murder had inevitably had a profound impact on her children, spouse, parents, friends, or dependents (paraphrasing a portion of Justice Souter's opinion concurring in the judgment in Payne v. Tennessee, 501 U.S. 808, 838, 111 S.Ct. 2597, 2615, 115 L.Ed.2d 720 (1991)).
Ex parte Rieber, 663 So.2d 999, 1005-06 (Ala. 1995).
We have examined the testimony about the victim's having no children of her own in light of all the evidence presented at trial and, as the Alabama Supreme Court concluded in Exparte Rieber, we readily conclude that the brief testimony did not deprive Gissendanner of a fair trial. We note, too, that the trial court instructed the jury that the State had the burden of proving Gissendanner's guilt beyond a reasonable doubt by establishing all of the elements of the crimes charged in the indictment. (R. 1533-53.) The court also instructed the jury that its verdict must not be influenced by questions of public interest or policy or by any other consideration outside the evidence. (R. 1554.) Finally, the court instructed the jurors that they were to apply their common sense, in an honest and impartial way, to determine what they believed to be the truth based on the evidence. (R. 1555.)
For all of the foregoing reasons, we hold that no plain error occurred as a result of Link's testimony. Gissendanner is not entitled to any relief on this claim.
 IV.
Gissendanner next argues that the trial court erred to reversal when it overruled his objection that the jury venire did not accurately represent a fair cross-section of the community and declined to impanel another venire. The State contends that the trial court correctly denied Gissendanner's objection to the jury venire because, it says, Gissendanner did not establish a violation of the fair cross-section requirement. After the trial court excused members of the jury venire for reasons of hardship and medical problems, Gissendanner objected to the venire. Gissendanner, who is black, alleged that the 2000 federal census determined that blacks made up 20.7% of the population in Dale County, while only 14% — 11 members of the 80-member venire — was black. Gissendanner further argued that, after the court had excused 12 members, 11 black veniremembers (16%) remained. Gissendanner further argued that blacks were systematically underrepresented, that his constitutional rights had been violated, and that the court should impanel a jury that accurately reflected the percentages of black and white citizens in the county.
Mary Bludsworth, the court clerk, testified that she had submitted a form to the Administrative Office of Courts (AOC), requesting a venire for Gissendanner's trial. She testified that AOC typically sends the request to the driver's license division and names are randomly selected from driver's license rolls. The names are then returned to AOC, and AOC sends out juror summons. (R. 133.) Gissendanner argued that the method of selecting venires "is not an accurate reflection of the African Americans represented on a venire" because "[m]any blacks have lost their driver's license[s] through failure to pay fines, departmental suspensions such as drug possession convictions. And a lot of them drive without a license." (R. 135.) The selection from driver's license rolls failed to secure a venire that accurately reflected the percentage of blacks, Gissendanner argued. The prosecutor disagreed with Gissendanner's assertion that more blacks *Page 968 
than whites are "irresponsible citizens" who had lost their driver's licenses and who continued to drive without licenses and urged the court to disregard that argument. The trial court overruled Gissendanner's objection to the venire.
On appeal, Gissendanner argues that he established at trial that the fair cross-section requirement was violated due to the systematic exclusion of blacks from the venire, and that blacks are unfairly excluded from other venires in the county. We disagree.
The Sixth Amendment to the United States Constitution requires that juries be drawn from venires that fairly represented the community. Taylor v. Louisiana, 419 U.S. 522, 537-38,95 S.Ct. 692, 42 L.Ed.2d 690 (1975). "Defendants are not entitled to a jury of any particular composition, Fay v. NewYork, 332 U.S. 261, 284 (1947); Apodaca v. Oregon,
[406 U.S. 404, 413 (1972)] (plurality opinion); but the jury wheels, pools of names, panels, or venires from which juries are drawn must not systematically exclude distinctive groups in the community and thereby fail to be reasonably representative thereof." 419 U.S. at 538, 95 S.Ct 692.
The United States Supreme Court stated in Duren v.Missouri, 439 U.S. 357, 364, 99 S.Ct. 664, 58 L.Ed.2d 579
(1979):
 "In order to establish a prima facie violation of the fair-cross-section requirement, the defendant must show (1) that the group alleged to be excluded is a `distinctive' group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process."
439 U.S. at 364, 99 S.Ct. 664.
Gissendanner failed to establish the second and third required elements. He offered no evidence to support his allegation that blacks made up 20.7% of the Dale County population in the 2000 census. Moreover, even if we were to assume that the allegation was factually correct, we are not prepared to hold that the percentage of blacks on Gissendanner's venire (16%) was not fair or reasonable in relation to the number of blacks in the community.
More importantly, however, Gissendanner failed to establish that the alleged underrepresentation was due to systematic exclusion of blacks from the jury-selection process. Durenv. Missouri, 439 U.S. at 366, 99 S.Ct. 664 ("His undisputed demonstration that a large discrepancy occurred not just occasionally but in every weekly venire for a period of nearly a year manifestly indicates that the cause of the underrepresentation was systematic — that is, inherent in the particular jury-selection process utilized."). Mary Bludsworth, the circuit clerk, testified that veniremembers were randomly selected under the direction of AOC from the list of county residents with driver's licenses. This Court has repeatedly held that the random selection of veniremembers from driver's license rolls satisfies the fair cross-section requirement. E.g., Acklin v. State, 790 So.2d 975,985-86 (Ala.Crim.App. 2000); Carroll v. State,852 So.2d 801, 807-08 (Ala.Crim.App. 1999), and cases cited therein. Gissendanner presented only unsupported assertions that "[m]any blacks have lost their driver's license[s] through failure to pay fines, departmental suspensions such as drug possession convictions. And a lot of them drive without a license." (R. 135.) Gissendanner presented no evidence *Page 969 
to support this prong of his fair-cross-section claim.
Gissendanner failed to establish a prima facie violation of the fair-cross-section requirement. The trial court correctly overruled Gissendanner's objection to the venire. Gissendanner is not entitled to any relief on this claim of error.
 V.
Gissendanner next argues that the trial court abused its discretion when it allowed the jury to view a videotape taken of the victim's decomposed body in the ditch where it was found. Specifically, he argues that the prejudice caused by showing the 14-minute videotape substantially outweighed its probative value, particularly because the jury also viewed still photographs of the scene.
Trial courts are vested with the discretion to determine whether images of a crime scene are admissible, and appellate courts overturn those decisions only when the trial courts abuse that substantial discretion. E.g., Stallworth v. State,868 So.2d 1128, 1151 (Ala.Crim.App. 2001). Rule 403, Ala. R. Evid., provides, "Although relevant, evidence may be excluded if its probative value is substantially out-weighed by the danger of unfair prejudice. . . ."
 "Additionally, in Gentry v. State, 689 So.2d 894, 907 (Ala.Cr.App. 1994), this Court stated:
 "'"It has long been the law in Alabama that `[p]hotographs which show the external wounds in the body of a deceased victim, even though they are cumulative and based on undisputed matters, are admissible. The fact that they are gruesome is not grounds to exclude them so long as they shed light on the issues being tried.' Burton v. State, 521 So.2d 91 (Ala.Cr.App. 1987). See also Kinder v. State, 515 So.2d 55 (Ala.Cr.App. 1986). The fact that a photograph is gruesome and ghastly is no reason to exclude it from evidence, so long as the photograph has some relevancy to the proceedings, even if the photograph may tend to inflame the jury. Magwood v. State, 494 So.2d 124, 141 (Ala.Cr.App. 1985). See also Hutto v. State, 465 So.2d 1211
(Ala.Cr.App. 1984); Jones v. State, 439 So.2d 776 (Ala.Cr.App. 1983); Godbolt v. State, 429 So.2d 1131 (Ala.Cr.App. 1982)."'
 "Gentry v. State, supra, quoting Bank-head v. State, 585 So.2d 97 (Ala.Cr.App. 1989). `"This rule of law applies not only to photographs, but to photographic slides as well. Goffer v. State, 430 So.2d 896
(Ala.Cr.App. 1983)."' Gentry, supra, quoting Bankhead."
Ward v. State, 814 So.2d 899, 906 (Ala.Crim.App. 2000).
Before the videotape was played for the jury, the prosecutor played it for the court and Gissendanner outside the jury's presence. Gissendanner objected to the admission of the videotape and argued that the tape's 14-minute focus on Snellgrove's body was "ghastly," and that the prosecutor should be limited to showing still photographs. (R. 1194-96.) He argued that limiting the State's evidence to photographs would not impede the State's case, while admitting the videotape would be highly prejudicial. The prosecutor argued, in part, that the jurors had to be fully informed of the facts of the case. He stated:
 "They want to know what happened. They want to know where Mrs. Snell-grove was found, the layout of the land. They want to know how she was — if she was concealed, what kind of clothes she was wearing — or in this case, not wearing, the position of *Page 970 
her body, how remote this area is."
(R. 1198.) The trial court overruled Gissendanner's objection, and the videotape was played for the jury.
We have viewed the entire videotape depicting the victim's body and the area in which it was found. The videotape showed, from several different angles, that the body had been left in a secluded area, covered by branches and sticks, some of which appeared to have been recently cut from nearby trees. Several minutes of the videotape showed only panoramic views of the rural, isolated countryside surrounding the ditch where Snellgrove's body was left. The videotape also included views of a roadway near the area where Snellgrove was found, and strands of hair on a barbed-wire fence that was between the roadway and the ditch. The wires of the barbed-wire fence where the hair was attached were spread apart, suggesting that Snellgrove might have been pulled between those strands of barbed wire before she was dumped in the ditch. The images were relevant to show the effort the killer took to dispose of and to conceal the victim's body. The videotape also demonstrated that some of the victim's clothing had been removed, and she was clad only in a sandal, panties, and a shirt and brassiere that had been pulled up around her neck, exposing her breasts. Because Gissendanner was charged with murder during the course of a rape, the victim's missing clothing and exposed breasts were relevant to that charge. Finally, the videotape corroborated the testimony of Officer Presswood, who observed and videotaped the body and the area surrounding it, and Dr. Ward, who conducted the autopsy and testified that dental records had to be used to identify Snellgrove because of the state of decomposition of her body. We find nothing so prejudicial in the videotape to warrant reversal of the trial judge's decision.
Gissendanner's reliance on McKee v. State,33 Ala.App. 171, 31 So.2d 656 (1947), is misplaced. Although he claims that the issue now before us was the same issue presented inMcKee, we disagree. McKee's conviction was reversed because a prejudicial photograph of the deceased victim was admitted into evidence. However, the Court described the photograph as follows:
 "Exhibit `J' is a photograph of deceased's body after dissection. It shows deceased's body from the upper forehead to a point about midway of the hips. The body is lying on its back. The torso has been opened, the lower line of the dissection being at about a line drawn from the crest of the hip-bones and extending to a depth of about two thirds of the body. The incision then extends up the body to a point close to the arm pits. The thick flap of skin and fascia thus created has been thrown back covering deceased's face. The inner vitals of deceased are exposed in the large area thus uncovered. Five streams of dark fluid, we presume blood, are running down the uncut portion of the torso. The picture further shows a robed figure back of the body with rubber gloved hands pushed into the vitals so as to disclose a dark object which we know from [the toxicologist's] testimony to be the spleen. On this organ there is a dark line which is the rupture. However another dark line of less width extends diagonally across the spleen. This we assume is blood."
33 Ala.App. at 176, 31 So.2d at 660. The videotape of the Snellgrove's body and the area in which it was hidden present no issue like the autopsy photograph in McKee. *Page 971 
Gissendanner argues that the probative value of the videotape was outweighed by its prejudicial effects and that the witness testimony and the photographs were sufficient to accurately depict the area and the victim's decomposed body. This, however, is not the appropriate standard of review. This Court is not free to render its own decision as to the weighing of probative value versus prejudice; rather, this Court must determine whether the trial court abused its discretion when it conducted that weighing and then admitted the videotape. We find no abuse of discretion here.
 "The videotape here is without question prejudicial; however, "while such direct evidence of a crime is certainly prejudicial to a defendant's case, without more, it is not unfairly so.' [United States v.] Weisz, 718 F.2d [413,] 432 [(D.C. Cir. 1983).]
 "`In a criminal prosecution much of the evidence is prejudicial to the defendant but that does not rule it out if it is competent as well, as this evidence was when you can gainsay the value of a motion picture, the commission of the crime. Indeed, this is the answer to a prosecutor's dream, to have such evidence as this.'
 "[United States v.] Guerrero, 667 F.2d [862,] 867 [(10th Cir.1981)]."
Ivery v. State, 686 So.2d 495, 519 (Ala.Crim.App. 1996).
In Mack v. State, 736 So.2d 664 (Ala.Crim.App. 1998), the appellant argued that videotape of the victim's body and the burned vehicle in which it was found was cumulative and prejudicial and that it should not have been admitted. We disagreed, and stated:
 "By our account, the tape played for 31 minutes and 48 seconds. Among the contents on the videotape were footage of the outside of the car, the inside of the car, the car's floorboards, the car tag, the area around the car, a spot on the ground, projectiles on the ground, repeated footage of [the victim's] body as it lay in the trunk — including close-up footage of [the victim's] face — the removal of [the victim's] body from the car trunk to a gurney, officers' attempting to straighten [the victim's] arm, which was affected by rigor mortis, the trunk after the removal of [the victim's] body, the removal of [the victim's] wallet from the trunk, the inside of [the victim's] wallet, and the wallet being placed on the sheet covering [the victim's] body as it lay on the gurney.
 "At trial Mack requested that the repeated footage of [the victim's] body not be shown to the jury. He suggested some editing or covering the television screen to conceal this from the jury. The trial court denied the request. On appeal, Mack argues that the entire tape was cumulative to other evidence presented at trial; that it did not prove or disprove a disputed issue; that it did not illustrate or elucidate some relevant fact or evidence; and that it did not corroborate or disprove other evidence.
 "The videotape of the crime scene, including the footage of [the victim's] body, was admissible.
 "In Ex parte Siebert, 555 So.2d 780, 783
(Ala. 1989), a capital case, Siebert argued that `the court erred in admitting into evidence a videotape of the crime scene, which was filmed by the police before the victims' bodies were removed. Siebert contends that the videotape was prejudicial and that it was cumulative of the photographic evidence also admitted.' Siebert, 555 So.2d at 783. The victims in Siebert were a 24-year-old mother and her 4- and 5-year-old sons. A police officer videotaped the interior of the victims' apartment before the crime scene was disturbed. `The trial *Page 972 
court admitted the videotape into evidence and permitted the jury to view it, over the defendant's objections that the tape was inflammatory, prejudicial, and cumulative, and that the portion of the tape showing the photographs of the family that were hung on the apartment walls had no probative value.' Id. The Alabama Supreme Court affirmed the Court of Criminal Appeals' holding that the trial court did not err in receiving the videotape into evidence, stating:
 "`Photographic evidence is admissible in a criminal prosecution if it tends to prove or disprove some disputed or material issue, to illustrate some relevant fact or evidence, or to corroborate or dispute other evidence in the case. Photographs that tend to shed light on, to strengthen, or to illustrate other testimony presented may be admitted into evidence. Chunn v. State, 339 So.2d 1100, 1102 (Ala.Cr.App. 1976). To be admissible, the photographic material must be a true and accurate representation of the subject that it purports to represent. Mitchell v. State, 450 So.2d 181, 184 (Ala.Cr.App. 1984). The admission of such evidence lies within the sound discretion of the trial court. Fletcher v. State, 291 Ala. 67, 277 So.2d 882, 883 (1973); Donahoo v. State, 505 So.2d 1067, 1071 (Ala.Cr.App. 1986) (videotape evidence). Photographs illustrating crime scenes have been admitted into evidence, as have photographs of victims and their wounds. E.g., Hill v. State, 516 So.2d 876 (Ala.Cr.App. 1987). Furthermore, photographs that show the external wounds of a deceased victim are admissible even though the evidence is gruesome and cumulative and relates to undisputed matters. E.g., Burton v. State, 521 So.2d 91 (Ala.Cr.App. 1987). Finally, photographic evidence, if relevant, is admissible even if it has a tendency to inflame the minds of the jurors. Hutto v. State, 465 So.2d 1211, 1212
(Ala.Cr.App. 1984).'
 "Siebert, 555 So.2d at 783-84."
736 So.2d at 672-73. See also Snyder v. State,893 So.2d 488, 541 (Ala.Crim.App. 2003).
Based on the foregoing legal principles, we cannot find that the trial court abused its substantial discretion when it admitted the videotape. Although parts of the videotape showing Snellgrove's body were indeed gruesome, we find no abuse of discretion in the trial court's conclusion that the videotape was not unfairly prejudicial. Gissendanner is not entitled to any relief on this claim.
 VI.
Gissendanner's last argument is that the trial court erred when it denied his motion for a judgment of acquittal. Specifically, he argues that the State's case was wholly circumstantial and that the evidence did not exclude every inference consistent with his innocence. Gissendanner moved for a judgment of acquittal at the end of the State's case and after all of the evidence was presented. Each time, the trial court denied the motion.
 "`"Appellate courts are limited in reviewing a trial court's denial of a motion for judgment of acquittal grounded on insufficiency." McFarland v. State, 581 So.2d 1249, 1253 (Ala.Crim.App. 1991). "The standard of review in determining sufficiency of evidence is whether evidence existed at the time [the defendant's] motion for acquittal was made, from which the jury could by fair inference find the [defendant] guilty." Linzy v. State, 455 So.2d 260, 26[2] (Ala.Crim.App. 1984) (citing Stewart v. State, *Page 973 350 So.2d 764 (Ala.Crim.App. 1977), and Hayes v. State, 395 So.2d 127 (Ala.Crim.App.), writ denied, 395 So.2d 150 (Ala. 1981)). In determining the sufficiency of the evidence, we view the evidence in the light most favorable to the State. Limy,
supra.'"
"Ex parte Burton, 783 So.2d 887, 890-91 (Ala. 2000).
 "`The role of appellate courts is not to say what the facts are. Our role . . . is to judge whether the evidence is legally sufficient to allow submission of an issue for decision to the jury.' Ex parte Bankston, 358 So.2d 1040, 1042 (Ala. 1978)."
Ex parte Williford, 931 So.2d 10, 13 (Ala. 2005).
 "`"Whether circumstantial evidence tending to connect the defendant with the crime excludes, to a moral certainty, every other reasonable hypothesis than that of the defendant's guilt is a question for the jury and not the court." [Cumbo v. State, 368 So.2d 871 (Ala.Crim.App. 1978)]; Cannon v. State, 17 Ala.App. 82, 81 So. 860 (1919). Our function is not to be factfinders, however tempting that may sometimes be. We must not substitute ourselves for jurors, nor play their role in the criminal process. Jury verdicts should not be disturbed unless they are not based upon evidence sufficient to meet the test set out above.'
"Linzy [v. State, 455 So.2d 260,] at 262 [(Ala.Crim.App. 1984)]."
Parker v. State, 589 So.2d 773, 776
(Ala.Crim.App. 1991).
The State presented sufficient evidence from which the jury could have excluded all reasonable hypotheses except that of guilt. Taken in a light most favorable to the State, the evidence tended to show that on Friday morning, June 22, 2001, Margaret Snellgrove was beaten in her carport and forced into the trunk of her car. Her body was later dumped in a ditch in an isolated rural area and was covered with branches and limbs. A black man was seen driving the victim's car in the area near the victim's home on the morning she was murdered. Gissendanner was seen driving Snellgrove's car that day, and he parked it at Queen Esther Morris's house, near where Snellgrove's body was later found. Gissendanner told some of his friends that he had purchased the car from an old white woman. He told others that the car belonged to someone else and that he had borrowed it. Gissendanner testified at trial that he had rented the car from a man who wanted to buy drugs from him. On Saturday, June 23, 2001, Gissendanner paid Alvin Cole to drive him to the bank where Snellgrove had an account. Gissendanner cashed a forged check made out to him and drawn on Snellgrove's account. The police searched an abandoned trailer where Gissendanner was known to stay; the trailer was not far from the remote area where Snellgrove's body was later found. Inside the trailer the police found a bucket containing Snellgrove's keys, her purse, her cellular phone, and other personal items belonging to Snellgrove. Police later found clothing that matched those Gissendanner wore on the day Snellgrove was murdered; Snellgrove's blood was found on some of the clothing. Finally, in the early evening hours of Saturday, June 23, 2001, Gissendanner paid his ex-wife $100 to drive him to Montgomery.
Viewing the evidence in the light most favorable to the State and affording all legitimate inferences from the evidence, we find that the jury could have reasonably determined that Gissendanner intentionally killed Margaret Snellgrove during the course of a robbery and a kidnapping. The evidence presented was legally sufficient to submit the case to the jury for its decision. The thrust of Gissendanner's argument *Page 974 
is that the version of events to which he testified at trial and the circumstantial nature of the State's evidence required the trial court to grant his motions for a judgment of acquittal. To the contrary, though circumstantial, the State's evidence was more than adequate to allow the jury to consider whether Gissendanner was guilty of the crimes charged. Similarly, that Gissendanner testified to a version of events that exonerated him did not require the trial court to grant the motion for acquittal; rather, that testimony simply created a fact question to be resolved by the jury. The trial court did not err when it denied the motions for acquittal and Gissendanner is not entitled to any relief on this claim.
 VII.
In accordance with Rule 45A, Ala. R.App. P., we have examined the record for plain error with respect to Gissendanner's capital-murder convictions, whether the error was brought to our attention or to the attention of the trial court. We find no plain error or defect in the proceedings during the guilt phase of the trial.
We have also reviewed Gissendanner's sentence in accordance with § 13A-5-53, Ala. Code 1975, which requires that we also review the propriety of the death sentence. This review requires a determination of the following: (1) whether any error adversely affecting Gissendanner's rights occurred in the sentence proceedings; (2) whether the trial court's findings concerning the aggravating and mitigating circumstances are supported by the evidence; and (3) whether death is the appropriate sentence in the case. Section 13A-5-53(b) requires that, in determining whether death is the proper sentence, we must consider: (1) whether the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor; (2) whether an independent weighing of the aggravating and mitigating circumstances by this Court indicates that death is the proper sentence; and (3) whether the sentence is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant.
After the jury convicted Gissendanner of murder during the course of a robbery and murder during the course of a kidnapping or an attempted kidnapping, the trial court held a separate sentencing hearing in accordance with §§ 13A-5-45 and -46, Ala. Code 1975. After hearing evidence concerning the aggravating and mitigating circumstances and after being properly instructed by the trial court as to the applicable law, the jury recommended a sentence of death. Ten of the jurors voted in favor of imposition of the death sentence and two jurors voted in favor of a sentence of life imprisonment without the possibility of parole. Thereafter, the trial court held a separate sentencing hearing, in accordance with § 13A-5-47, Ala. Code 1975. The trial court ordered and received a written presentence investigation report, as required by § 13A-5-47(b), Ala. Code 1975. In its sentencing order, the trial court entered specific written findings concerning the aggravating circumstances enumerated in § 13A-5-49, Ala. Code 1975, that it found to exist, the mitigating circumstances enumerated in § 13A-5-51, Ala. Code 1975, and the nonstatutory mitigating circumstances it found to exist under § 13A-5-52, Ala. Code 1975, as well as written findings of fact summarizing the offense and Gissendanner's participation in it.
In the sentencing order, the trial court found the existence of the following statutory aggravating circumstances: (1) that the murder of Margaret Snellgrove was committed during the course of a robbery, see § 13A-5-49(4), Ala. Code 1975; (2) that the murder of Margaret Snellgrove was committed during the course of a kidnapping, *Page 975 
see § 13A-5-49(4), Ala. Code 1975; and (3) that Gissendanner committed the crime while he was under a sentence of imprisonment, see § 13A-5-49(1), Ala. Code 1975. The trial court found no statutory mitigating circumstances to exist. In accordance with § 13A-5-52, Ala. Code 1975, the trial court considered the evidence Gissendanner offered as nonstatutory mitigation; the trial court found the following to constitute nonstatutory mitigation: Gissendanner suffered from some diagnosable mental conditions; he made poor grades in school as a result of a learning disorder; he had poor verbal abilities but his nonverbal abilities were in the average range; and he suffered from anxiety and depression. In addition, the psychologist who tested Gissendanner concluded that Gissendanner "had a fairly long history of substance abuse, a mixed personality disorder, a narcissistic pattern and some antisocial traits which could not be diagnosed as antisocial personality disorder." (C. 146.) The court also found that Gissendanner participated in athletics in high school and was not known to be a discipline problem; he had good family relationships while he was growing up; he had been a good worker during his limited employment; he was not known to be violent to anyone in the community; he caused no problems during his incarceration for these offenses; he was a good student in Bible study and had been baptized; and he had some interaction with his daughters.
The trial court's sentencing order reflects that after considering all the evidence presented, the presentence report, and the advisory verdict of the jury, and after weighing the aggravating circumstances against the mitigating circumstances, the trial court found that the aggravating circumstances outweighed the mitigating circumstances. Accordingly, the trial court sentenced Gissendanner to death.
The trial court's findings concerning the aggravating circumstances and the mitigating circumstances are supported by the evidence, and we find no plain error or defect in the penalty phase of the proceedings.
Gissendanner was convicted of murder made capital because it occurred during the course of a robbery and during the course of a kidnapping. § 13A-5-40(a)(2) and -40(a)(1), Ala. Code 1975. We take judicial notice that similar crimes have been punished capitally throughout the State. See, e.g., Carruth v.State, 927 So.2d 866 (Ala.Crim.App. 2005), and cases cited therein dealing with murder during the course of kidnapping and murder during the course of robbery. We have carefully reviewed the record of the guilt phase and of the penalty phase of Gissendanner's trial, and we have found no evidence that the death sentence was imposed under the influence of passion, prejudice, or any other arbitrary factor. The trial court's findings and conclusions are amply supported by the evidence. We have independently weighed the aggravating circumstances against the mitigating circumstances, and we find that the aggravating circumstances outweigh the mitigating circumstances; therefore, we agree that death is the appropriate sentence in this case. Finally, we find that the sentence of death is neither excessive nor disproportionate to the penalty imposed in similar cases.
For the reasons stated herein, Gissendanner's capital-murder conviction and his sentence of death are affirmed.
AFFIRMED.
McMILLAN, P.J., and BASCHAB, SHAW, and WISE, JJ., concur.
[2] "The defendant is a black male.
[3] "The victim's niece testified that the victim often carried a Bible.
[4] "[Gissendanner] did not deny having and using the victim's automobile.
[5] "A knife was found in the stolen vehicle. The knife appeared to be freshly used for cutting wood. The limbs covering the victim's body had been cut there in the immediate vicinity of the ditch where she was found." *Page 976